## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

INTELLIGENT INVESTMENT
INTERNATIONAL LLC, BRANNON
CROSSING PARTNERS LLC, WALKS
AT JOHNS CREEK PARTNERS LLC,
WINDWARD MARKET FOREST
LLC, PALISADES WEST PACES
PARTNERS LLC, GII SPALDING
PLAZA LLC, COOPER VILLAGE
PARTNERS LLC, PEACHTREE MED
BUILDING PARTNERS LLC,
EASTSIDE MED PARTNERS LLC,

     Plaintiffs,

v.

EMILY FU, CAPITAL INVESTMENT
INTERNATIONAL, INC., JACOB FU,
JOSHUA FU, NINA XU

     Defendants.

Civil Action No.

_____

## COMPLAINT FOR DAMAGES
## <u>AND EQUITABLE AND INJUNCTIVE RELIEF</u>

Plaintiffs Intelligent Investment International LLC, Brannon Crossing

Partners LLC, Walks at Johns Creek Partners LLC, Windward Market Forest LLC,

Palisades West Paces Partners LLC, GII Spalding Plaza LLC, Cooper Village

Partners LLC, Peachtree Med Building Partners LLC, Eastside Med Partners LLC

(collectively "Plaintiffs") file this Complaint and respectfully plead as follows:

I.    **PARTIES, JURISDICTION, AND VENUE** ................................................5

II.  **FACTUAL BACKGROUND** ........................................................8

   A.  **BACKGROUND** ........................................................8

   B.  **COMMERCIAL REAL ESTATE INVESTMENTS** ...........................11

     1.    Intelligent Investment International LLC ...............................12

     2.    Brannon Crossing Partners LLC ......................................16

     3.    Walks at Johns Creek Partners LLC ................................19

     4.    Windward Market Forest LLC ......................................23

     5.    Palisades West Paces Partners LLC ................................28

     6.    GII Spalding Plaza LLC ............................................34

     7.    Cooper Village Partners LLC.......................................36

     8.    Peachtree Med Building Partners LLC .............................41

     9.    Eastside Med Partners LLC ........................................46

   C.  **MISAPPROPRIATION OF ASSETS** ...................................50

     1.    Personal Use of Company Funds ..................................51

     2.    Unauthorized Loans ..............................................54

       a.    The Shoppes at Brannon ......................................54

       b.    Spalding Plaza.................................................55

     3.    Ghost Properties ..................................................57

       a.    Sugarloaf Center ..............................................57

       b.    North Atlanta Primary Care ...................................59

       c.    Eastside Building ..............................................60

     4.    Purchase Price Discrepancies.......................................62

       a.    Market Forest Shops ..........................................62

       b.    Cooper Retail Center...........................................63

       c.    Peachtree Corners .............................................63

   **D. DAMAGES** ...................................................................64

      1. Business Interruption..........................................65

      2. Money and Other Damages.................................67

**III. CAUSES OF ACTION** ...............................................68

  COUNT I:  FEDERAL RICO (18 U.S.C. § 1962(c)) ............68

  COUNT II:  FEDERAL RICO (18 U.S.C. § 1962(d))...........70

  COUNT III:  CONVERSION ...............................................71

  COUNT IV:  FRAUDULENT MISREPRESENTATION ..................................73

  COUNT V:  BREACH OF FIDUCIARY DUTY .................................74

  COUNT VI:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY 75

  COUNT VII:  MONEY HAD AND RECEIVED.................................76

  COUNT VIII: GEORGIA RICO (O.C.G.A. § 16-14-4)....................................77

  COUNT IX: CIVIL CONSPIRACY .....................................78

  COUNT X: DECLARATORY JUDGMENT ........................................79

  COUNT XI:  EQUITABLE REFORMATION ...................................80

  AND OTHER EQUITABLE RELIEF ...........................................80

  COUNT XII:  INJUNCTIVE RELIEF.....................................82

  COUNT XIII:  PUNITIVE DAMAGES (O.C.G.A. § 51-12-5.1(f)) ...................83

  COUNT XIV:  ATTORNEYS' FEES (O.C.G.A. § 13-6-11).............................84

## I.    <u>PARTIES, JURISDICTION, AND VENUE</u>

1.    Plaintiff Intelligent Investment International LLC ("Intelligent") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

2.    Plaintiff Brannon Crossing Partners LLC ("Brannon Crossing") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

3.    Plaintiff Walks at Johns Creek Partners LLC ("Johns Creek") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

4.    Plaintiff Windward Market Forest LLC ("Windward Market") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

5.    Plaintiff Palisades West Paces Partners LLC ("Palisades") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

6.      Plaintiff GII Spalding Plaza LLC ("GII Spalding") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

7.      Plaintiff Cooper Village Partners LLC ("Cooper Village") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

8.      Plaintiff Peachtree Med Building Partners LLC ("Peachtree Med") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

9.      Plaintiff Eastside Med Partners LLC ("Eastside Med") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

10.     Defendant Emily Fu is an individual residing in Gwinnett County, Georgia. Emily Fu is subject to this Court's personal jurisdiction.

11.     Defendant Capital Investment International, Inc. ("Capital Investment") is a Georgia corporation with its principal place of business at 1300 Peachtree Industrial Blvd., Suite 3209, Suwanee, GA, Gwinnett County, 30024. Capital Investment is subject to this Court's personal jurisdiction.

12.   Defendant Jacob Fu is an individual residing in Gwinnett County.  Jacob Fu
      is subject to this Court's personal jurisdiction.

13.   Defendant Joshua Fu is an individual residing in Gwinnett County.  Joshua
      Fu is subject to this Court's personal jurisdiction.

14.   On information and belief, Nina Xu is an individual residing in Georgia and
      is therefore subject to this Court's personal jurisdiction.

15.   This Court has subject matter jurisdiction over this action pursuant to 18
      U.S.C. § 1964, , 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

16.   Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28
      U.S.C. § 1391 because, among other reasons, Defendants Emily Fu, Jacob
      Fu, Joshua Fu are subject to personal jurisdiction in this judicial district and
      reside in this district.  Also, this is a judicial district in which a substantial
      part of the events and omissions giving rise to Plaintiffs' claims occurred.

17.   Based on the allegations in Paragraphs 1 through 16, jurisdiction and venue
      are proper in this Court.

18.   All conditions precedent, if any, to the claims and causes of action asserted
      herein have been satisfied or waived.

## II.   FACTUAL BACKGROUND

### A.   BACKGROUND

19.   Wanjiong Lin is the Founder and Chairman of Self China, an LED technology and manufacturing company headquartered in Ningbo, China. Self China is a global corporation with locations in Ningbo and Shenzhen, China; Cologne, Germany; and the United States.

20.   Self China owns two Georgia corporations that manage U.S. real estate holdings and investments, Ninglanta Industry, Inc. ("Ninglanta") and Goldenfield Industry, Inc. (d/b/a Goldenfield Investment, Inc.) ("Goldenfield").  Kaiyou Lin, Wanjiong Lin's son, is currently Vice President of Ninglanta and President of Goldenfield.

21.   In or around 2011, a family friend introduced Wanjiong Lin to Emily Fu, a licensed realtor.  Emily Fu served as Wanjiong Lin's realtor for two residential properties and insinuated herself into the good graces of the Lin family.

22.   On information and belief, Emily Fu is the sole owner of Capital Investment. Capital Investment is an investment and advisory firm, which, among other

things, holds itself out as working with high net-worth individuals, many of them in China, to secure commercial real estate for investment purposes.

23.   Until November 13, 2017, Nina Xu was CEO of the company, and Emily Fu's sons, Jacob Fu and Joshua Fu (the "Fu Sons"), were Secretary/CFO and registered agent, respectively.

24.   Nina Xu was responsible for asset management and property development at Capital Investment.  She reported directly to Emily Fu.  Capital Investment touted Nina Xu's prior experience as the Chairman of a "mega" real estate company in China with over $6 billion in assets and her experience in commercial and residential real estate development.

25.   On information and belief, the Fu Sons, along with Nina Xu, participated in the management of the company and/or the management of investment properties on behalf of Capital Investment's clients.

26.   On information and belief, the Fu Sons and Nina Xu each had knowledge of Emily Fu's and Capital Investment's transactions with investors, including the investments involving the Plaintiffs in this action.  The Fu Sons, themselves, participated in certain investment projects.

27.   Emily Fu, Capital Investment, and the Fu Sons were also direct beneficiaries of transactions with the company's clients, including Plaintiffs, in that each was assigned an ownership percentage of certain companies under management purportedly in exchange for contributed initial capital. Nevertheless, each received or agreed to receive income/profit sharing distributions based on their purported ownership percentage of the respective companies, even though they failed to pay for those ownership interests.

28.   On November 13, 2017, Capital Investment's annual registration with the Georgia Secretary of State was amended to remove the Fu sons and Nina Xu as officers and to establish Emily Fu as CEO, Secretary, and Registered Agent and Rory Strong as CFO.  The fact remains, however, that Jacob Fu was CEO and CFO of the company from 2011 to 2014 and CFO from 2011 to 2017; Joshua Fu was registered agent from 2011 to 2017; and Nina Xu was CEO beginning in 2014.  Thus, the Fu Sons and Nina Xu were officers and/or participated in the management of the company during the transactions Plaintiffs described in this Complaint.

### B.    COMMERCIAL REAL ESTATE INVESTMENTS

29.    In or around 2014, Wanjiong Lin told Emily Fu that he was interested in investing in commercial real estate, and Emily Fu offered her services and that of her company, Capital Investment, to assist with the purchase of commercial real estate in the United States and to handle the management of the properties.

30.    Emily Fu told Wanjiong Lin and Kaiyou Lin (collectively the "Lins") that she handled similar investments for other high net worth individuals based in China.  The Lins introduced Emily Fu to some of their friends and family members in China who were similarly interested in investing in commercial real estate in the United States.

31.    Between the middle of 2014 and early 2017, Emily Fu created investment prospectuses, marketed, and recommended numerous commercial real estate properties to Ninglanta, Goldenfield, the Lins, and other investors based in China.  The Lins, together with their friends and family members (collectively the "Lin Investors"), invested in nine properties.  Kaiyou Lin sometimes served as the liaison between the Lin Investors and Emily Fu, but Emily Fu also communicated directly with individual investors.

### 1.    Intelligent Investment International LLC

32.    In or around May 2014, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to potential investors, including to Wanjiong Lin by email, describing the Shoppes at Mall of Georgia ("Mall of Georgia"), located at 2815 Buford Drive, Buford, GA.  The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including location information, existing tenants, purchase price of $3,800,000, and an expected rate of return of 8.5% per year.  The purpose of the prospectus was to convince investors to contribute capital to purchase the Mall of Georgia.

33.    Emily Fu took potential investors and/or their representatives, Luyong Li, Kaiyou Lin, and Jieyong Cao, on a tour of the Mall of Georgia and told them that it was a good investment.  She told them she would handle all aspects of the transaction, including acting as broker; recommending legal and other advisors; coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold the Mall of Georgia.

34.  In or around September 2014, five individual investors, Wengang Yu, Kaiyou Lin, Deyin Li, Yi Wang, and Sigang Zhang, established Plaintiff Intelligent Investment International LLC ("Intelligent").  The purpose of Intelligent was to purchase and hold the Mall of Georgia.

35.  Emily Fu told the Intelligent members that an attorney drafted the operating agreement, and she was named Manager of the company.  As Manager, she gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of [Intelligent]."  Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed only by unanimous consent of the members.

36.  The Intelligent members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests.  They also trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

37.   As set forth in the Intelligent operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| W. Yu | $586,500 |
| K. Lin | $703,800 |
| D. Li | $351,900 |
| Y. Wang | $117,300 |
| S. Zhang | $586,500 |
| Total Initial Contribution | $2,346,000 |

38.   Emily Fu used a Capital Investment bank account to receive the Intelligent members' payment of earnest money for the purchase of Mall of Georgia.

39.   Emily Fu opened a bank account in the name of Intelligent at Touchmark National Bank ("Touchmark"), and, in or about August 2014, provided wiring information by email to Kaiyou Lin to be distributed to the other members, instructing them to wire money from China into the Intelligent bank account. The funds represented each investor's initial capital contribution to Intelligent and were for the purpose of purchasing the Mall of Georgia.

40.   In or about September 2014, the Intelligent members caused funds in payment of their initial capital contribution to be wired from Hong Kong into the Intelligent bank account as instructed by Emily Fu.

41.   On or around September 17, 2014, Emily Fu sent Kaiyou Lin what

purported to be a closing statement for the purchase of the Mall of Georgia

to be distributed to the Intelligent members.  The statement reflected that

Intelligent would purchase the Mall of Georgia for $3,800,000 with cash and

a loan from Touchmark in the amount of $1,900,000.

42.   As Manager with expansive powers, Emily Fu had sole and full control of

Intelligent.  Emily Fu reported that she and Capital Investment assisted with

the management of the Mall of Georgia property, including overseeing the

collection of rent and payment of operating expenses.  She emailed

Intelligent members, including Kaiyou Lin, periodic financial statements for

the Mall of Georgia, which reflected income from the property and operating

expenses and indicated that it was profitable.

43.   Emily Fu also transmitted financial data by email to Intelligent's accountants

for tax preparation purposes and prepared and periodically emailed members

an investor distribution worksheet showing the ownership percentages and

profit distribution for each member.

44.   Her most recent email providing distribution information was sent to Kaiyou

Lin on or about July 30, 2017.  She indicated in the worksheet that 10% of

each foreign member's distribution was being withheld for tax purposes, but on information and belief, such withholdings were not paid to the Internal Revenue Service ("IRS").

45.     Between July 8, 2015 and March 12, 2016, Emily Fu communicated repeatedly with Intelligent members via group chats on the WeChat[1] app. She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### 2.     Brannon Crossing Partners LLC

46.     In or around March 27, 2014, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to Ninglanta by email describing the Shoppes at Brannon Crossing ("Shoppes at Brannon"), located at 405 Peachtree Parkway, Cumming, GA.  The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including location information, existing tenants, purchase price of $15,000,000, and an expected capitalization rate of 8% a year.  The purpose of the prospectus

---

[1] WeChat is a Chinese messaging app.

was to convince Ninglanta to contribute capital to purchase the Shoppes at Brannon.

47.   Emily Fu took Wanjiong Lin, Luyong Li, and Jieyong Cao, representatives of Ninglanta, on a tour of the Shoppes at Brannon and told them that it was a good investment.  She told them she would handle all aspects of the transaction, including acting as broker; recommending legal and other advisors; and coordinating third party services, including environment and property appraisals.

48.   In or around October  2014, Ninglanta, established Plaintiff Brannon Crossing Partners LLC  ("Brannon Crossing") as its sole member, and Yi Wang was named Manager.  Emily Fu was not named an officer of Brannon Crossing or authorized to take action on behalf of the company.  The purpose of Brannon Crossing was to purchase and hold the Shoppes at Brannon.

49.   Emily Fu assisted Ninglanta with opening a bank account at Bank of America and provided wiring information to Ninglanta, instructing it to wire money into the Brannon Crossing bank account.  The funds were for the purpose of purchasing the Shoppes at Brannon.

50.   In or about July to October 2014, Ninglanta caused a total of $15,000,000 to be wired into the Brannon Crossing bank account as instructed by Emily Fu.

51.   On or around October 10, 2014, Emily Fu emailed Ninglanta what purported to be a closing statement for the purchase of the Shoppes at Brannon.  The statement reflected that Brannon Crossing would purchase the Shoppes at Brannon for $15,000,000 in an all cash transaction.

52.   Emily Fu and Capital Investment purportedly assisted with the management of the Shoppes at Brannon property, including overseeing the collection of rent and payment of operating expenses.

53.   Emily Fu uploaded to Dropbox[2] periodic financial statement packages prepared by the Shoppes at Brannon property manager.  The package included income statements, balance sheets, aging reports, bank statements, bank reconciliations, rent rolls, and general ledger account statements.  The documents did not show that a mortgage was outstanding on the Shoppes at Brannon and indicated that it was profitable.

---

[2] Dropbox is a file hosting service.

54.   Emily Fu also transmitted financial data by email to the Brannon Crossing accountants for tax preparation purposes.

### 3.   Walks at Johns Creek Partners LLC

55.   In or around January 2015, Emily Fu, on behalf of Capital Investment, took potential investors Wanjiong Lin, Tan-Yu Lee, and Anni Lee on a tour of the Walks at Johns Creek shopping center ("Walks") located at 11030 & 11035 Medlock Bridge Road, Johns Creek, GA.  The purpose of the tour was to convince the investors to contribute capital to purchase the Walks.

56.   Emily Fu told them she would take a majority position in the project, and she would handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors; coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold the Walks.

57.   In or around February 2015, five individual investors, Jacob Fu, Larina Hsiu-Lan Lin, Wanjiong Lin, Tan-Yu Lee, and Anni Lee, established Plaintiff Walks at Johns Creek Partners LLC ("Johns Creek").  The purpose of Johns Creek was to purchase and hold the Walks.

58.  Emily Fu told the Johns Creek members that an attorney drafted the operating agreement, and she was named Manager of the company.  As Manager, she gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of the [Johns Creek]."  Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed as Manager only by unanimous consent of the members, which could never happen because she or one of her associates is a member of the company.

59.  The Johns Creek members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests.  They also trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

60.  As set forth in the Johns Creek operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| Jacob Fu | $1,710,354 |
| T. Lee | $624,937 |
| L. Lin | $411,143 |
| W. Lin | $542,709 |
| Total Initial Contribution | $3,289,143 |

61. Emily Fu used a Capital Investment bank account to receive the Johns Creek members' payment of earnest money for the purchase of the Walks.

62. Emily Fu opened a bank account in the name of Johns Creek at Touchmark, and, in or about January 2015, provided wiring information to Wanjiong Lin and other members by WeChat and other methods, instructing them to wire money from China into the Johns Creek bank account.  The funds represented each investor's initial capital contribution to Johns Creek and were for the purpose of purchasing the Walks.

63. In or about January 2015, the Johns Creek members caused funds in payment of their initial capital contribution to be deposited into the Johns Creek bank account as instructed by Emily Fu.

64. On information and belief, Jacob Fu, Emily Fu's son and accomplice, did not wire money into the Johns Creek bank account or otherwise contribute

initial capital to Johns Creek.  Emily Fu withheld that information from the non-related members.

65.   Emily Fu subsequently informed the non-related Johns Creek members that she would purchase another property, the Sugarloaf Center, located at 1950 Satellite Blvd., Duluth, GA (the "Sugarloaf Center"), instead.

66.   On or around April 27, 2015, Emily Fu emailed the non-related Johns Creek members what purported to be a closing statement for the purchase of the Sugarloaf Center.  The statement reflected that Johns Creek would purchase the Sugarloaf Center for $3,250,000 in an all cash transaction.  The statement was purportedly signed by the seller and Emily Fu, as Manager of Johns Creek.

67.   As Manager with expansive powers, Emily Fu had sole and full control of Johns Creek.  Emily Fu reported that she and Capital Investment assisted with the management of the Sugarloaf Center, including overseeing the collection of rent and payment of operating expenses.  She emailed Johns Creek members, including Kaiyou Lin, purported periodic financial statements for the Sugarloaf Center, which reflected income from the property and operating expenses and indicated that it was profitable.

68.   Emily Fu also transmitted financial data by email to Johns Creek's

accountants for tax preparation purposes and prepared and periodically

emailed members an investor distribution worksheet showing the ownership

percentages and profit distribution for each member.

69.   Her most recent email providing distribution information was sent to Kaiyou

Lin on or about July 30, 2017, and it showed ownership percentages and

profit distribution even for Jacob Fu, who, on information and belief, did not

contribute any capital to Johns Creek.  She indicated in the worksheet that

10% of each foreign member's distribution was being withheld for tax

purposes, but on information and belief, such withholdings were not paid to

the IRS.

70.   On information and belief, Jacob Fu received profit distributions to which he

was not entitled.

### 4.      Windward Market Forest LLC

71.   In or around June 5, 2015, Emily Fu, on behalf of Capital Investment, sent

an investment prospectus to investors residing in China, including to Kaiyou

Lin by email, describing the Market Forest Shops, located at 6195

Windward Pkwy, Alpharetta, GA.  The prospectus bore Capital Investment's

logo on each page and provided information regarding the property,

including location information, existing tenants, purchase price of

$3,900,000, and an expected rate of return of 7.5% per year.  The purpose of

the prospectus was to convince the investors to contribute capital to purchase

Market Forest Shops.

72.     Emily Fu took Tan-Yu Lee, a representative of potential investors, on a tour

of Market Forest Shops and told him that it was a good investment.  She told

him she would handle all aspects of the transaction, including acting as

broker; recommending lenders, legal and other advisors; coordinating third

party services, including environment and property appraisals; and serving

as manager of the LLC that would hold Market Forest Shops.

73.     In or around August 2015, six investors, Yu Shi, Jiang Bian, Fangfang Guo,

Kaiyou Lin, Deyin Li, and Capital Investment, established Plaintiff

Windward Market Forest LLC ("Windward Market").  The purpose of

Windward Market was to purchase and hold Market Forest Shops.

74.     Emily Fu told the Windward Market members that an attorney drafted the

operating agreement, and she was named Manager of the company.  As

Manager, she gave herself broad powers, including "full, absolute and

complete authority, power and discretion to manage and control the business and affairs of the [Windward Market]." Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed as Manager only by unanimous consent of the members, which could never happen because she or one of her associates is a member of the company.

75. The Windward Market members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests. They also trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

76. As set forth in the Windward Market operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| Y. Shi | $456,681 |
| J. Bian | $456,681 |
| F. Guo | $456,681 |
| K. Lin | $456,681 |
| D. Li | $342,511 |
| Capital Investments | $114,170 |
| Total Initial Contribution | $2,283,405 |

77.     Emily Fu used a Capital Investment bank account to receive the Windward

Market members' payment of earnest money for the purchase of Market

Forest Shops.

78.     Emily Fu opened a bank account in the name of Windward Market at

Touchmark, and, on or about August 18, 2015, provided wiring information

by WeChat to Kaiyou Lin to be distributed to the other members, instructing

them to wire money from China into the Windward Market bank account.

The funds represented each investor's initial capital contribution to

Windward Market and were for the purpose of purchasing Market Forest

Shops.

79.     In or about August 20, 2015, Windward Market members caused funds in

payment of their initial capital contribution to be wired from China and

Hong Kong into the Windward Market bank account as instructed by Emily

Fu.

80.     On information and belief, Capital Investment, Emily Fu's company and

accomplice, did not wire money into the Windward Market bank account or

otherwise contribute initial capital to Windward Market.  Emily Fu withheld

that information from the non-related members.

81. On or around October 28, 2015, Emily Fu sent Kaiyou Lin what purported to be a closing statement for the purchase of Market Forest Shops to be distributed to the non-related Windward Market members. The statement reflected that Windward Market would purchase Market Forest Shops for $3,900,000 with cash and a loan from Touchmark in the amount of $1,950,000.

82. As Manager with expansive powers, Emily Fu had sole and full control of Windward Market. Emily Fu reported that she and Capital Investment assisted with the management of Market Forest Shops, including overseeing the collection of rent and payment of operating expenses. She emailed Windward Market members, including Kaiyou Lin, periodic financial statements for Market Forest Shops, which reflected income from the property and operating expenses and indicated that it was profitable.

83. Emily Fu also transmitted financial data by email to Windward Market's accountants for tax preparation purposes and prepared and periodically emailed members an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

84.    Her most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages and profit distribution even for Capital Investment, which, on information and belief, did not contribute any capital to Windward Market.  She indicated in the worksheet that 10% of each foreign member's distribution was being withheld for tax purposes, but on information and belief, such withholdings were not paid to the IRS.

85.    On information and belief, Capital Investment received profit distributions to which it was not entitled.

86.    Between July 6, 2015 and June 3, 2016, Emily Fu communicated repeatedly with Windward Market members via group chats on the WeChat app.  She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### 5.    Palisades West Paces Partners LLC

87.    On or around February 14, 2016, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to investors residing in China, including to Kaiyou Lin by WeChat, describing the North Atlanta Primary Care condominium ("North Atlanta Primary Care"), located at 3200 Downwood

Circle, Unit 200, Atlanta, GA.  The prospectus bore Capital Investment's

logo on each page and provided information regarding the property,

including location information, existing tenants, purchase price of

$1,450,000, and an expected rate of return of 7.7% per year.  The purpose of

the prospectus was to convince the investors to contribute capital to purchase

North Atlanta Primary Care.

88.  Emily Fu took a representative of potential investors, Jieyong Cao, on a tour

of North Atlanta Primary Care and told him that it was a good investment.

She told him she would handle all aspects of the transaction, including

acting as broker; recommending lenders, legal and other advisors;

coordinating third party services, including environment and property

appraisals; and serving as manager of the LLC that would hold North

Atlanta Primary Care.

89.  In or around March 2016, four individual investors, ChenChao Wang,

Kaiyou Lin, Fangfang Guo, and Joshua Fu, established Plaintiff Palisades

West Paces Partners LLC ("Palisades").  The purpose of Palisades was to

purchase and hold North Atlanta Primary Care.

90. Emily Fu told the Palisades members that an attorney drafted the operating agreement, and she was named Manager of the company. As Manager, she gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of the [Palisades]." Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed as Manager only by unanimous consent of the members, which could never happen because she or one of her associates is a member of the company.

91. The Palisades members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests. They also trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

92. As set forth in the Palisades operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| C. Wang | $459,167 |
| K. Lin | $459,167 |
| F. Guo | $459,167 |
| Joshua Fu | $72,500 |
| **Total Initial Contribution** | $1,450,001 |

93.    Emily Fu used a Capital Investment bank account to receive the Palisades members' payment of earnest money for the purchase of North Atlanta Primary Care.

94.    Emily Fu opened a bank account in the name of Palisades at Metro City Bank, and, in or about March 27, 2016, provided wiring information by WeChat to ChenChao Wang, Kaiyou Lin, and Fangfang Guo, instructing them to wire money from China into the bank account.  The funds represented each investor's initial capital contribution to Palisades and were for the purpose of purchasing North Atlanta Primary Care.

95.    In or about March 2016, the Palisades members caused funds in payment of their initial capital contribution to be wired from China and Hong Kong into the Palisades bank account as instructed by Emily Fu.

96.    On information and belief, Joshua Fu, Emily Fu's son and accomplice, did not wire money into the Palisades bank account or otherwise contribute

initial capital to Palisades.  Emily Fu withheld that information from the
non-related members.

97.   On or around April 15, 2016, Emily Fu sent Kaiyou Lin by WeChat what
purported to be a closing statement for the purchase of North Atlanta
Primary Care.  The statement reflected that Palisades would purchase North
Atlanta Primary Care for $1,450,000 in an all cash transaction.  The
statement purportedly bore the signature of the seller and Emily Fu as
Manager of Palisades.

98.   As Manager with expansive powers, Emily Fu had sole and full control of
Palisades.  Emily Fu reported that she and Capital Investment assisted with
the management of North Atlanta Primary Care, including overseeing the
collection of rent and payment of operating expenses.  She emailed Palisades
members, including Kaiyou Lin, purported periodic financial statements for
North Atlanta Primary Care, which reflected income from the property and
operating expenses and indicated that it was profitable.

99.   Emily Fu also transmitted financial data by email to Palisades' accountants
for tax preparation purposes and prepared and periodically emailed members

an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

100.   Her most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages and profit distribution even for Joshua Fu, who, on information and belief, did not contribute any capital to Palisades.  She indicated in the worksheet that 10% of each foreign member's distribution was being withheld for tax purposes, but on information and belief, such withholdings were not paid to the IRS.

101.   On information and belief, Joshua Fu received profit distributions to which he was not entitled.

102.   Between March 12, 2016 and May 27, 2016, Emily Fu communicated repeatedly with Palisades members via group chats on the WeChat app.  She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### 6.    GII Spalding Plaza LLC

103.   On or around January 23, 2016, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to representatives of Goldenfield by email describing the Spalding Plaza shopping center ("Spalding Plaza"), located at 6470 Spalding Drive, Norcross, GA.  The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including location information, existing tenants, purchase price of $5,195,000, and a capitalization rate of 8.33% per year.  The purpose of the prospectus was to convince the investors to contribute capital to purchase the Spalding Plaza.

104.   Emily Fu took Wanjiong Lin, Kaiyou Lin, Jieyong Cao, and Yi Wang, representatives of Goldenfield, on a tour of Spalding Plaza and told them that it was a good investment.  She told them she would handle all aspects of the transaction, including acting as broker; and coordinating third party services, including environment and property appraisals.

105.   In or around June 2016, Goldenfield established Plaintiff GII Spalding Plaza LLC  ("GII Spalding") as its sole member, and Yi Wang was named Manager.  Emily Fu was named the Executive Vice President but was

prohibited from taking certain actions, including "obligat[ing] the Company under any loan or commitment for any loan, refinance[ing] any loan or encumber[ing] any asset of the Company."  The purpose of GII Spalding was to purchase and hold Spalding Plaza.

106.   Emily Fu opened a bank account in the name of the GII Spalding at Metro City Bank and subsequently added Yi Wang to the account.  Emily Fu instructed Goldenfield to deposit funds into the GII Spalding bank account for the purpose of purchasing Spalding Plaza.

107.   In or about May 2016, Goldenfield caused a total of $5,170,000 to be transferred into the GII Spalding bank account as instructed by Emily Fu.

108.   On or around June 30, 2016, Emily Fu sent Goldenfield what purported to be a closing statement for the purchase of Spalding Plaza.  The statement reflected that GII Spalding would purchase Spalding Plaza for $5,150,000 in an all cash transaction.

109.   Emily Fu and Capital Investment purportedly assisted with the management of Spalding Plaza, including overseeing the collection of rent and payment of operating expenses.

110.  Emily Fu uploaded to Dropbox periodic financial statement packages

prepared by the Spalding Plaza property manager.  The package included

income statements, balance sheets, aging reports, bank statements, bank

reconciliations, rent rolls, and general ledger statements.  The documents did

not show that a mortgage was outstanding on Spalding Plaza and indicated

that it was profitable.

111.  Emily Fu also transmitted financial data by email to GII Spalding's

accountants for tax preparation purposes.

### 7.    Cooper Village Partners LLC

112.  In or around May 2016, Emily Fu, on behalf of Capital Investment, sent an

investment prospectus to investors residing in China, including to Kaiyou

Lin by WeChat, describing the Cooper Village Retail Center ("Cooper Retail

Center"), located at 1132-1142 Athens Highway, Grayson, GA.  The

prospectus bore Capital Investment's logo on each page and provided

information regarding the property, including location information, existing

tenants, purchase price of $5,800,000, and an expected rate of return of

about 8% per year.  The purpose of the prospectus was to convince the

investors to contribute capital to purchase the Cooper Retail Center.

113.   Emily Fu took potential investors and/or their representatives, Wanjiong Lin, Kaiyou Lin, and Tan-Yu Lee, on a tour of the Cooper Retail Center and told them that it was a good investment.  She told them she would handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors; coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold the Cooper Retail Center.

114.   In or around May 2016, nine individual investors, Chang Yu, Wengang Yu, Kaiyou Lin, Qiongyang Li, Chenchao Wang, Wenling Zhao, Tan-Yu Lee, Anni Lee, and Emily Fu, established Plaintiff Cooper Village Partners LLC ("Cooper Village").  The purpose of Cooper Village was to purchase and hold the Cooper Retail Center.

115.   Emily Fu told the Cooper Village members that an attorney drafted the operating agreement, and she was named Manager of the company.  As Manager, she gave herself broad powers, including "full and complete authority, power and discretion to manage and control the day-to-day business, affairs and properties of [ Cooper Village]."  Under the agreement,

absent extraordinary circumstances, Emily Fu could be removed as Manager only by vote of 75% of the ownership interests in Cooper Village.

116. The Cooper Village members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests. They also trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

117. As set forth in the Cooper Retail Center operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| C. Yu | $1,046,095 |
| W. Yu | $538,431 |
| K. Lin | $538,431 |
| Q. Li | $276,908 |
| C. Wang | $276,908 |
| W. Zhao | $276,908 |
| T. Lee | $46,151 |
| A. Lee | $46,151 |
| Emily Fu | $30,768 |
| Total Initial Contribution | $3,076,751 |

118.   Emily Fu used a Capital Investment bank account to receive the Cooper
Village members' payment of earnest money for the purchase of the Cooper
Retail Center.

119.   Emily Fu opened a bank account in the name of Cooper Village at
Touchmark, and, in or about May 2016, provided wiring information by
WeChat to the members, instructing them to wire money from China into the
Cooper Village bank account.  The funds represented each investor's initial
capital contribution to Cooper Village and were for the purpose of
purchasing the Cooper Retail Center.

120.   In or about May 2016, the Cooper Village members caused funds in
payment of their initial capital contribution to be wired from China into the
Cooper Village bank account as instructed by Emily Fu.

121.   On information and belief, Emily Fu did not wire money into the Cooper
Village bank account or otherwise contribute initial capital to Cooper
Village.  Emily Fu withheld that information from the non-related members.

122.   On or around July 27, 2016, Emily Fu sent Kaiyou Lin what purported to be
a closing statement for the purchase of the Cooper Retail Center to be
distributed to the Cooper Village members.  The statement reflected that

Cooper Village would purchase the Cooper Retail Center for $5,800,000 with cash and a loan from Touchmark in the amount of $2,900,000.

123. As Manager with expansive powers, Emily Fu had sole and full control of Cooper Village. Emily Fu reported that she and Capital Investment assisted with the management of the Cooper Retail Center property, including overseeing the collection of rent and payment of operating expenses. She emailed Cooper Village members, including Kaiyou Lin, periodic financial statements for the Cooper Retail Center, which reflected income from the property and operating expenses and indicated that it was profitable.

124. Emily Fu also transmitted financial data by email to Cooper Village's accountants for tax preparation purposes and prepared and periodically emailed members an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

125. Her most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages and profit distribution even for Emily Fu, who, on information and belief, did not contribute any capital to Cooper Village. She indicated in the worksheet that 10% of each foreign member's distribution was being withheld for tax

purposes, but on information and belief, such withholdings were not paid to the IRS.

126. On information and belief, Emily Fu received profit distributions to which she was not entitled.

127. Between May 16, 2016 and October 29, 2016, Emily Fu communicated repeatedly with Cooper Village members via group chats on the WeChat app.  She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### 8.    Peachtree Med Building Partners LLC

128. In or around March 2016, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to investors residing in China, including to Kaiyou Lin by WeChat, describing the Peachtree Corners Medical Building ("Peachtree Corners"), located at 3780 Holcomb Bridge Rd., Norcross, GA. The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including area information, tenants, purchase price of $1,850,000, and an expected rate of return of about 10.8%

per year.  The purpose of the prospectus was to convince the investors to contribute capital to purchase Peachtree Corners.

129.  Emily Fu took Yi Wang, a representative of potential investors, on a tour of Peachtree Corners and told her that it was a good investment.  She told her she would handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors; coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold Peachtree Corners.

130.  In or around May 2016, five individual investors, SiGang Zhang, Fang Han, Wenling Zhao, Kaiyou Lin, and Jacob Fu, established Plaintiff Peachtree Med Building Partners LLC ("Peachtree Med").  The purpose of Peachtree Med was to purchase and hold Peachtree Corners.

131.  Emily Fu told the Peachtree Med members that an attorney drafted the operating agreement, and she was named Manager of the company.  As Manager, she gave herself broad powers, including unlimited authority to conduct the business of the company.  Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed as Manager only by unanimous consent of the

members, which could never happen because she or one of her associates is a member of the company.

132.   The Peachtree Med members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests.  They also trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

133.   As set forth in the Peachtree Med operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| S. Zhang | $372,242 |
| F. Han | $372,242 |
| W. Zhao | $273,708 |
| K. Lin | $32,845 |
| Jacob Fu | $43,793 |
| Total Initial Contribution | $1,094,830 |

134.   Emily Fu used a Capital Investment bank account to receive the Peachtree Med members' payment of earnest money for the purchase of Peachtree Corners.

135. Emily Fu opened a bank account in the name of Peachtree Med at Touchmark, and in or around May 5, 2016, provided wiring information by WeChat to Kaiyou Lin to be distributed to the other members, instructing them to wire money from China into the Peachtree Med bank account. The funds represented each investor's initial capital contribution to Peachtree Med and were for the purpose of purchasing Peachtree Corners.

136. In or about May 2016, the Peachtree Med members caused funds in payment of their initial capital contribution to be wired from China into the Peachtree Med bank account as instructed by Emily Fu.

137. On information and belief, Jacob Fu, Emily Fu's son and accomplice, did not wire money into the Peachtree Med bank account or otherwise contribute initial capital to Peachtree Med. Emily Fu withheld that information from the non-related members.

138. On or around June 17, 2016, Emily Fu sent Peachtree Med investors by WeChat what purported to be a closing statement for the purchase of Peachtree Corners. The statement reflected that Peachtree Med would purchase Peachtree Corners for $1,850,000 with cash and a loan from Touchmark in the amount of $925,000.

139.   As Manager with expansive powers, Emily Fu had sole and full control of Peachtree Med.  Emily Fu reported that she and Capital Investment assisted with the management of Peachtree Corners, including overseeing the collection of rent and payment of operating expenses.  She emailed Peachtree Med members, including Kaiyou Lin, periodic financial statements for Peachtree Corners, which reflected income from the property and operating expenses and indicated that it was profitable.

140.   Emily Fu also transmitted financial data by email to Peachtree Med's accountants for tax preparation purposes and prepared and periodically emailed members an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

141.   Her most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages and profit distribution even for Jacob Fu, who, on information and belief, did not contribute any capital to Peachtree Med.  She indicated in the worksheet that 10% of each foreign member's distribution was being withheld for tax purposes, but on information and belief, such withholdings were not paid to the IRS.

142.   On information and belief, Jacob Fu received profit distributions to which he was not entitled.

143.   Between April 13, 2016 and July 17, 2016, Emily Fu communicated repeatedly with Peachtree Med members via group chats on the WeChat app.  She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### 9.     Eastside Med Partners LLC

144.   In or around October 30, 2016, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to investors residing in China, including to Kaiyou Lin by WeChat, describing the Eastside Digital Imaging building ("Eastside Building"), located at 3445 Highway 81 South, Loganville, GA. The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including area information, existing tenants, purchase price of $5,650,000, and an expected rate of return of about 7.82% per year.  The purpose of the prospectus was to convince the investors to contribute capital to purchase the Eastside Building.

145. Emily Fu took potential investors and/or their representatives, Chang Yu and Jieyong Cao, on a tour of the Eastside Building and told them it was a good investment.  She told them she would handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors; coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold the Eastside Building.

146. In or around November 2016, ten investors, Kaiyou Lin, Chang Yu, Fangfang Guo, Deyin Li, Yajun Sun, Lina Xiao, Yu Shi, Xiaohua Yao, Yi Wang, and Capital Investment established Plaintiff Eastside Med Partners LLC ("Eastside Med").  The purpose of Eastside Med was to purchase and hold the Eastside Building.

147. Emily Fu told the Eastside Med members that an attorney drafted the operating agreement, and she was named Manager of the company.  As Manager, she gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of the [Eastside Med]."  Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu

could be removed as Manager only by unanimous consent of the members, which could never happen because she or one of her associates is a member of the company.  The Eastside Med members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests.  They also trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

148.  As set forth in the Eastside Med operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
| --- | --- |
| K. Lin | $636,000 |
| C. Yu | $636,000 |
| F. Guo | $318,300 |
| D. Li | $318,300 |
| Y. Sun | $318,300 |
| L. Xiao | $318,300 |
| Y. Shi | $222,810 |
| X. Yao | $222,810 |
| Y. Wang | $95,490 |
| Capital Investments | $95,490 |
| Total Initial Contribution | $3,181,800 |

149. Emily Fu used a Capital Investment bank account to receive the Eastside
     Med members' payment of earnest money for the purchase of the Eastside
     Building.

150. Emily Fu opened a bank account in the name of Eastside Med at Metro City
     Bank and, on or about November 16, 2016, provided wiring information by
     WeChat to Kaiyou Lin to be distributed to the other members, instructing
     them to wire money from China into the Eastside Med bank account.  The
     funds represented each investor's initial capital contribution to Eastside Med
     and were for the purpose of purchasing the Eastside Building.

151. In or about November 2016, the Eastside Med members caused funds in
     payment of their initial capital contribution to be deposited into the Eastside
     Med bank account as instructed by Emily Fu.

152. On information and belief, Capital Investment, Emily Fu's company and
     accomplice, did not wire money into the Eastside Med bank account or
     otherwise contribute initial capital to Eastside Med.  Emily Fu withheld that
     information from the non-related members.

153. On or around January 19, 2017, Emily Fu sent Kaiyou Lin what purported to
     be a closing statement for the purchase of the Eastside Building to be

distributed to the Eastside Med members.  The statement reflected that Eastside Med would purchase the Eastside Building for $5,650,000 with cash and a loan from Touchmark in the amount of 2,825,000.  The statement purportedly bore the signature of the seller and Emily Fu as Manager of Eastside Med.

154.   As Manager with expansive powers, Emily Fu had sole and full control of Eastside Med.  Emily Fu reported that she and Capital Investment assisted with the management of the Eastside Building, including overseeing the collection of rent and payment of operating expenses.

155.   Between November 9, 2016 and December 14, 2016, Emily Fu communicated repeatedly with Eastside members via group chats on the WeChat app.  She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### C.    MISAPPROPRIATION OF ASSETS

156.   Based on certain incidents that had occurred within the preceding months, the Lins became suspicious of Emily Fu.  As investors in the various entities, themselves, and Kaiyou Lin being the liaison for the individual investors in

China, the Lins decided to reassign the management responsibilities related to the real estate investments.

157. In November 2017, they met with Emily Fu to begin that process. Wanjiong Lin and an associate, Jieyong Cao, attended the meeting.

## 1. Personal Use of Company Funds

158. During that meeting, Emily Fu admitted that she had taken approximately $930,000 without authorization and for personal use from bank accounts related to the various entities as follows:

| Affected Property | Amount Taken |
|---|---|
| Intelligent Investment | $152,736.17 |
| Windward Forest | $200,000.00 |
| Johns Creek | $38,000.00 |
| Palisades | $80,000.00 |
| Peachtree Med | $45,000.00 |
| Cooper Village | $51,850.00 |
| Eastside | $163,000.00 |
| Brannon Crossing | $200,000.00 |
| **TOTAL** | **$930,586.17** |

159.   Plaintiffs had no knowledge of any of these facts and relied on Emily Fu's numerous representations and the various statements she emailed to them regarding the financial status of their properties.

160.   As the Manager for seven of the entities and required to act in their best interest, Plaintiffs were justified in relying on Emily Fu's representations regarding the status of their affairs.

161.   Emily Fu apologized for her wrongdoing and promised to return the funds. She further provided assurances that she would continue managing the properties until her duties were transferred to someone of Wanjiong Lin's choice.

162.   Emily Fu agreed to meet Hongjuan Liu and Kaiyou Lin on Monday, November 20, 2017, to travel together to all banks where Plaintiffs' accounts were being held to obtain and review the respective account information. On the morning of November 20, 2017, Emily Fu contacted Kaiyou Lin via WeChat to inform him that she was on her way to pick him up for the meeting.  But Emily Fu never arrived and has since ceased all communications with the Lins.

163. After Emily Fu failed to appear for the meeting, Hongjuan Liu called Emily
Fu's assistant, Gina Thomas ("Thomas"), who told her she had no
knowledge of Emily Fu's whereabouts.

164. Thomas also told the Lins that she was concerned about a past due notice
that recently arrived from Touchmark addressed to Brannon Crossing. The
notice indicated that a loan payment of $34,533 was past due on the Shoppes
at Brannon. This notice both surprised and alarmed the Lins as Brannon
Crossing was purchased in an all cash transaction and should be held free
and clear of any encumbrances. Ninglanta had no knowledge of a loan on
the Shoppes at Brannon, and the financial statements Emily Fu had provided
to Ninglanta bore no evidence of a loan.

165. Given this discovery, the Lins undertook to research the status of their
properties to the extent possible using public records since Emily Fu, as
Manager for seven of the properties, had complete control over the financial
and other records relating to the properties.

### 2.     Unauthorized Loans

166.   The Lins discovered that Emily Fu had executed loans on at least two of the properties owned by the entities without the authorization or knowledge of the members of the respective entities.

### a.     The Shoppes at Brannon

167.   A search of Forsyth county records revealed that a loan in the amount of $6,000,000 was recorded against the Shoppes at Brannon on December 5, 2014.  The security deed was signed by Emily Fu as "President" of Brannon Crossing.

168.   However, Ninglanta is the company's sole member, and Yi Wang has always been its sole Manager with the exclusive power to appoint and delegate authority to officers.  Yi Wang never appointed Emily Fu as President or otherwise granted her authority to execute a loan against the Shoppes at Brannon.

169.   Emily Fu knew she was not authorized to execute a loan against the Shoppes at Brannon and knew she was not the "President" of the company when she executed the loan documents.  Yi Wang has no evidence that the proceeds of

this loan were deposited in a Brannon Crossing account or that Brannon Crossing benefited from the unauthorized loan in any way.

170. It appears Emily Fu made false representations to Touchmark in order to improperly obtain an unauthorized loan in the name of Brannon Crossing for her personal use.

171. None of the periodic financial statements Emily Fu provided to Ninglanta or its accountants referenced any outstanding loan or loan payments.  Ninglanta was therefore prevented from learning about the existence of the unauthorized loan.  It justifiable relied on Emily Fu to provide a truthful account of the financial status of the property and certainly to refrain from taking out secret, unauthorized loans in Brannon Crossing's name since she assisted with the management of the property.

**b.    Spalding Plaza**

172. A search of Gwinnett county records revealed that a loan in the amount of $2,665,000 was recorded against Spalding Plaza on July 27, 2016.  The security deed was signed by Emily Fu as "Executive Vice President" of Spalding Plaza.

173. However, as Executive Vice President of Spalding Plaza, Emily Fu was not authorized to enter into any loan agreement on behalf of the company without the prior written consent of Yi Wang, sole Manager of GII Spalding.

174. Emily Fu knew she was not authorized to execute a loan against Spalding Plaza when she executed the loan documents.  Yi Wang has no evidence that the proceeds of this loan were deposited in a GII Spalding account or that GII Spalding benefited from the unauthorized loan in any way.

175. It appears Emily Fu made false representations to Touchmark in order to improperly obtain an unauthorized loan in the name of GII Spalding for her personal use.

176. None of the periodic financial statements Emily Fu provided to Goldenfield or its accountants referenced any outstanding loan or loan payments. Goldenfield was therefore prevented from learning about the existence of the unauthorized loan.  It justifiable relied on Emily Fu to provide a truthful account of the financial status of the property and certainly to refrain from taking out secret, unauthorized loans in GII Spalding's name since she assisted with the management of the property.

### 3.    Ghost Properties

177.   The Lins also discovered that at least three of the companies they had

formed and funded (in conjunction with other investors) to purchase specific

properties did not own those properties.

### a.    Sugarloaf Center

178.   Even though Emily Fu and Capital Investment provided a settlement

statement to Johns Creek investors showing that Johns Creek would

purchase the Sugarloaf Center and had sent other documents, including

financial statements and investor distribution worksheets, similarly showing

that Johns Creek owned that property, Gwinnett County records show no

transfer of ownership of the Sugarloaf Center to Johns Creek.

179.   The Sugarloaf Center continues to be owned by an unrelated entity—

Sugarloaf Center LLC.

180.   Emily Fu knew at the time she sent the settlement statement, financial

statements, and investor distribution worksheets that they were false.  She

sent the falsified documents to induce the non-related Johns Creek members

to send funds to her and Capital Investment and to cover up the illegal

conversion of their funds.

181.  It is unclear what happened to the more than $1.5 million that the Lin

investors who became Johns Creek members deposited in the Capital

Investment and Johns Creek bank accounts at Emily Fu's direction.  On

information and belief, Emily Fu had no intention to execute the Sugarloaf

Center purchase transaction and instead intended to convert the funds to her

personal use.

182.  Georgia Secretary of State records indicate that, on August 24, 2017, Johns

Creek was administratively dissolved for failing to file its annual

registration.  Johns Creek's reinstatement was secured on December 15,

2017.

183.  The Johns Creek investors relied on Emily Fu's numerous representations

regarding the status of the property and the various documents she emailed

to them, including a closing statement.  Because Emily Fu was Manager of

Johns Creek and legally and contractually required to act in the company's

best interest, the Johns Creek investors were justified in relying on Emily

Fu's representations regarding the Sugarloaf Center.

### b.    North Atlanta Primary Care

184.   Even though Emily Fu and Capital Investment provided a settlement statement to Palisades investors showing that Palisades would purchase North Atlanta Primary Care and had sent other documents, including financial statements and investor distribution worksheets, similarly showing that Palisades owned that property, Fulton County records show no transfer of ownership of North Atlanta Primary Care to Palisades.

185.   North Atlanta Primary Care was sold to REDUS Georgia Commercial, LLC—an unrelated entity—on April 20, 2016.

186.   Emily Fu knew at the time she sent the settlement statement, financial statements, and investor distribution worksheets that they were false.  She sent the falsified documents to induce the non-related Palisades members to send funds to her and Capital Investment and to cover up the illegal conversion of their funds.

187.   It is unclear what happened to the more than $1.3 million that the Lin investors who became Palisades members deposited in the Capital Investment and Palisades bank accounts at Emily Fu's direction.  On information and belief, Emily Fu had no intention to execute the North

Atlanta Primary Care purchase transaction and instead intended to convert the funds to her personal use.

188. The Palisades investors relied on Emily Fu's numerous representations regarding the status of the property and the various documents she emailed to them, including a closing statement. Because Emily Fu was Manager of Palisades and legally and contractually required to act in the company's best interest, the Palisades investors were justified in relying on Emily Fu's representations regarding North Atlanta Primary Care.

### c. Eastside Building

189. Even though Emily Fu and Capital Investment provided a settlement statement to Eastside Med investors showing that Eastside Med would purchase the Eastside Building and had sent other documents, including financial statements and investor distribution worksheets, similarly showing that Eastside Med owned that property, Walton County records show no transfer of ownership of the Eastside Building to Eastside Med.

190. The Eastside Building was sold to Eastside Medical Center, LLC—an unrelated entity—on July 31, 2017.

191.   Emily Fu knew at the time she sent the settlement statement, financial
statements, and investor distribution worksheets that they were false.  She
sent the falsified documents to induce the non-related Eastside Med
members to send funds to her and Capital Investment and to cover up the
illegal conversion of their funds.

192.   It is unclear what happened to the more than $3 million that the Lin
investors who became Eastside Med members deposited in the Capital
Investment and Eastside Med bank accounts at Emily Fu's direction.  On
information and belief, Emily Fu had no intention to execute the Eastside
Building purchase transaction and instead intended to convert the funds to
her personal use.

193.   Georgia Secretary of State records indicate that, on August 24, 2017,
Eastside Med was administratively dissolved for failing to file its annual
registration.  Eastside Med's reinstatement was secured on December 15,
2017.

194.   The Eastside Med investors relied on Emily Fu's numerous representations
regarding the status of the property and the various documents she emailed
to them, including a closing statement.  Because Emily Fu was Manager of

Eastside Med and legally and contractually required to act in the company's best interest, the Eastside Med investors were justified in relying on Emily Fu's representations regarding the Eastside Building.

### 4.    Purchase Price Discrepancies

195.   The Lins also discovered that the purchase price of at least three properties had been artificially inflated by Emily Fu and Capital Investment.

### a.    Market Forest Shops

196.   The purchase agreement and the transaction settlement statement Emily Fu provided to Windward Market members indicated that the Market Forest Shops purchase price was $3,900,000.  However, Fulton County records show that the purchase price was actually $3,500,000.

197.   It is unclear what happened to the $400,000 in excess of the purchase price Windward Market members provided to Emily Fu and Capital Investment to purchase the property.

198.   On information and belief, Emily Fu falsified the purchase agreement and the settlement statement intentionally to inflate the purchase price by $400,000 and convert those excess funds to her personal use.

### b.    Cooper Retail Center

199.  The purchase agreement and the transaction settlement statement Emily Fu

provided to Cooper Village members indicated that the Cooper Retail Center

purchase price was $5,800,000.  However, Gwinnett County records show

that the purchase price was actually $5,500,000.

200.  It is unclear what happened to the $300,000 in excess of the purchase price

Cooper Village members provided to Emily Fu and Capital Investment to

purchase the property.

201.  On information and belief, Emily Fu falsified the purchase agreement and

the settlement statement intentionally to inflate the purchase price by

$300,000 and convert those excess funds to her personal use.

### c.    Peachtree Corners

202.  The purchase agreement and the transaction settlement statement Emily Fu

provided to Peachtree Med members indicated that the Peachtree Corners

purchase price was $1,850,000.  However, Gwinnett County records show

that the purchase price was actually $1,400,000.

203. It is unclear what happened to the $450,000 in excess of the purchase price Peachtree Med members provided to Emily Fu and Capital Investment to purchase the property.

204. On information and belief, Emily Fu falsified the purchase agreement and the settlement statement intentionally to inflate the purchase price by $450,000 and convert those excess funds to her personal use.

### D.   DAMAGES

205. Upon discovery of Emily Fu's unauthorized and fraudulent actions, the Lins contacted the Federal Bureau of Investigation ("FBI") and the United States Department of Justice ("DOJ") to make a complaint.  Both the FBI and DOJ have assigned staff to this matter and have opened an investigation.

206. The Lins have been unable to locate Emily Fu, and at one point, Joshua Fu told Plaintiffs that Emily Fu may be in Ecuador.  An attorney subsequently contacted Plaintiffs' counsel to inform them that Emily Fu had retained him to represent her in the criminal investigation.  It appeared that Emily Fu was still in Georgia.  The attorney, however, subsequently informed Plaintiffs' counsel that he no longer represented Emily Fu.  The Fu sons, who were also

officers of Capital Investment and/or were involved in the management of the entities, have likewise refused to cooperate with Plaintiffs.

### 1.   Business Interruption

207.   Because Emily Fu is Manager with sole and full control of seven of the affected entities, Plaintiffs have been unable to operate their businesses effectively.  Many of the entities cannot access some or all of their bank accounts because Emily Fu is the only person authorized to access the accounts.  Additionally, absent authorization from Emily Fu or another duly appointed Manager, Metro City Bank, a financial institution at which Plaintiffs believe accounts are being held in the their names, has refused to provide information regarding any such accounts.  Thus, certain Plaintiffs do not know where their accounts are being held and what balances may remain in those accounts, if any.

208.   On information and belief, Emily Fu has drained and closed certain accounts and converted the funds in those accounts to her personal use.

209.   Further, certain Plaintiffs have been unable to negotiate year end lease renewals, enter into agreement for property management services, and take other actions necessary to operate a commercial real estate business because,

as Manager with sole authority over those entities, Emily Fu is the only person currently authorized to take such actions.

210.   Plaintiffs tried to obtain Emily Fu's and the Fu-related members' (Jacob Fu, Joshua Fu, Larina Hsiu-Lan Lin,[3] and Capital Investment) consent to remove Emily Fu as Manager of the entities and to appoint a replacement manager in her place, but after initially indicating that Emily Fu would cooperate with Plaintiffs, Emily Fu's counsel informed Plaintiffs' counsel on December 13, 2017 that he no longer represented her.  Thus, the only line of communication with Emily Fu is closed.

211.   Plaintiffs have obtained written consents to remove Emily Fu as Manager and appoint a new Manager from all members of each entity, except for the Fu-related members.  However, under the respective operating agreements of Johns Creek, Windward Market, Palisades, Peachtree Med, and Eastside Med, those consents may not be sufficient to remove Emily Fu because absent dismissal for narrowly defined "cause" or other extraordinary

---

[3] Larina Hsiu-Lan Lin is not related to the Lins, and, on information and belief, is related to Emily Fu's husband.

circumstances, unanimous consent, including from the Fu-related members, is required.

### 2.      Money and Other Damages

212.   As described above, Emily Fu, Capital Investment, Jacob Fu, Joshua Fu, and Nina Xu have, either independently or by agreement to act in concert, and/or with knowledge of Emily Fu's actions, misappropriated millions of dollars from Plaintiffs, including but not limited to the following: by converting funds provided for the purchase of commercial real estate to their personal use; inflating the purchase price of the properties and pocketing the difference; embezzling and spending money from the entities' bank accounts for personal use; obtaining unauthorized loans in certain entities names and converting the proceeds of those loans to personal use; taking ownership interests in and/or profit distributions from entities to which they did not contribute initial capital; facilitating and being complicit in Emily Fu's misrepresentations and other unlawful actions; and otherwise using the resources of the entities for unauthorized, personal use.

213. As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered damages, including but not limited to the loss of millions of dollars in cash.

214. Defendants engaged in willful, malicious and intentional conduct, all with the specific purpose of injuring Plaintiffs and have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

### III.   CAUSES OF ACTION
### COUNT I:  FEDERAL RICO (18 U.S.C. § 1962(c))

215. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 214 above as if fully stated herein.

216. Capital Investment is an enterprise engaged in, and whose activities affect, foreign commerce.  Emily Fu, Jacob Fu, Joshua Fu, and Nina Xu (the "Individual Defendants") are or were currently employed by or associated with Capital Investment at the time of the wrongdoing alleged herein.

217. The Individual Defendants agreed to and did conduct and participate in the conduct of Capital Investment's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs,

including by obtaining funds from Plaintiffs by fraudulent means and transmitting fraudulent documents to Plaintiffs by wire; causing to be transferred from China and Hong Kong money converted or taken by fraud from Plaintiffs; receiving unlawfully converted money across the United States border; and obtaining Plaintiffs' funds at Touchmark and other banks by means of fraudulent representations.

218. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of (1) obtaining money by means of fraudulent pretenses and representations and transmitting by wire writings for the purpose of executing the fraud in violation of 18 U.S.C. § 1343; (2) transferring in foreign commerce money converted or taken by fraud in violation of 18 U.S.C. § 2314; (3) receiving money that crossed the United States border after being unlawfully converted or taken in violation of 18 U.S.C. § 2315; and (4) obtaining Plaintiffs' funds at Touchmark and other banks by means of fraudulent representations in violation of 18 U.S.C. § 1344.

219. The acts set forth above, including wire fraud, transferring money taken by fraud, receiving unlawfully converted money across the United States

border, and obtaining Plaintiffs' funds at financial institutions by fraudulent means, constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

220. The Individual Defendants have directly and indirectly conducted and participated in the conduct of Capital Investment's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

221. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as set forth in Section II(D) above.

## COUNT II:  FEDERAL RICO (18 U.S.C. § 1962(d))

222. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 221 above as if fully stated herein.

223. As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), including by obtaining funds from Plaintiffs by fraudulent means and transmitting fraudulent documents to Plaintiffs by wire; causing to be transferred from China and Hong Kong money converted or taken by fraud from Plaintiffs; receiving unlawfully converted money across the United

States border; and obtaining Plaintiffs' funds at Touchmark and other banks by means of fraudulent representations.

224. Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise (Capital Investment) through a pattern of racketeering activity.

225. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

226. As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property as set forth in Section II(D) above.

## COUNT III:  CONVERSION

227. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 226 above as if fully stated herein.

228.  Defendants Emily Fu and Capital Investment (the "Capital Investment
      Defendants") were not authorized to withdraw for personal use funds held in
      Plaintiffs' bank accounts or otherwise take distributions to which they were
      not entitled.  They improperly assumed and exercised the right of ownership
      over such funds, and their actions were contrary to Plaintiffs' rights.

229.  The Capital Investment Defendants were not authorized to encumber the
      Shoppes at Brannon Crossing and Spalding Plaza properties with loans.
      They improperly assumed and exercised the right of ownership over such
      properties, and their actions were contrary to the rights of Brannon Crossing
      and Spalding Plaza.

230.  The Capital Investment Defendants were not authorized to retain for
      personal use Plaintiffs Johns Creek, Palisades, and Eastside Med's funds in
      specific accounts that were designated for the purchase of specified
      commercial real estate.  They improperly assumed and exercised the right of
      ownership over such specific funds and accounts, and their actions were
      contrary to the rights of Johns Creek, Palisades, and Eastside Med.

231.  The Capital Investment Defendants were not authorized to retain for
      personal use the excess funds they caused Plaintiffs Cooper Village,

Peachtree Med, and Windward Market to secure for the purchase of

specified commercial real estate.  They improperly assumed and exercised

the right of ownership over such funds, and their actions were contrary to the

rights of Cooper Village, Peachtree Med, and Windward Market.

232.   Plaintiffs have demanded that Defendants return the converted property, and

Defendants have not complied.

233.   Plaintiffs have suffered and will continue to suffer damages as a proximate

cause of the Capital Investment Defendants' actions.

## COUNT IV:  FRAUDULENT MISREPRESENTATION

234.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 233

above as if fully set forth herein.

235.   The Capital Investment Defendants provided false settlement statements and

other documents and information to Plaintiffs.

236.   The Capital Investment Defendants knew such settlement statements and

other documents and information provided to Plaintiffs were false.

237.   The Capital Investment Defendants made the false representations to induce

Plaintiffs to provide funds for the purchase of specified commercial real

estate or to cover up their illegal conversion of Plaintiffs' properties and/or funds.

238.   Plaintiffs justifiably relied on the Capital Investment Defendants' representations.

239.   Plaintiffs have suffered and will continue to suffer damages as a proximate cause of the actions of the Capital Investment Defendants.

## COUNT V:  BREACH OF FIDUCIARY DUTY

240.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 239 above as if fully stated herein.

241.   As Executive Vice President of GII Spalding, Emily Fu owed a fiduciary duty to the company.

242.   Emily Fu breached that duty by, among other things, her unauthorized encumbrance of Spalding Plaza with a loan underwritten by Touchmark.

243.   Spalding Plaza has suffered and will continue to suffer damages as a proximate cause of Emily Fu's breach of her fiduciary duty.

244. As Manager of Intelligent, Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, and Eastside Med, Emily Fu owed a fiduciary duty to those companies.

245. Emily Fu breached that duty by, among other things, converting the funds of those entities to her personal use and failing to purchase real estate as required in certain cases.

246. The affected entities have suffered and will continue to suffer damages as a proximate cause of Emily Fu's breach of her fiduciary duty.

## COUNT VI:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

247. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 246 above as if fully stated herein.

248. Defendants Capital Investment, Nina Xu, Jacob Fu, and Joshua Fu (the Count VI Defendants) knew that Emily Fu was the Manager of Plaintiffs Intelligent, Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, and Eastside Med and was the Executive Vice President of GII Spalding (the Count VI Plaintiffs) and therefore owed a duty to act in the best interests of those entities.

249. The wrongful actions of the Count VI Defendants, including facilitating Emily Fu's false representations or otherwise assisting or being complicit in Emily Fu's fraudulent actions, served to procure Emily Fu's breach of her fiduciary duty to the Count VI Plaintiffs.

250. The Count VI Defendants acted purposely and with malice and the specific intent to injure the Count VI Plaintiffs.

251. The Count VI Plaintiffs have suffered and will continue to suffer damages as a proximate cause of the actions of the Count VI Plaintiffs.

## COUNT VII:  MONEY HAD AND RECEIVED

252. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 251 above as if fully set forth herein.

253. The Capital Investment Defendants have placed themselves in the position of receiving and retaining money from Plaintiffs and did receive and retain money from Plaintiffs to which they were not lawfully entitled.  They have taken those sums of money from Plaintiffs improperly.

254. Plaintiffs have demanded that Defendants return such sums, and Defendants have not complied.

255.   Defendants should not be permitted to keep such sums of money in equity and good conscience.

256.   Plaintiffs have suffered and will continue to suffer damages as a proximate cause of the Capital Investment Defendants' actions.

257.   The Capital Investment Defendants must return those funds to Plaintiffs.

## COUNT VIII: GEORGIA RICO (O.C.G.A. § 16-14-4)

258.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 257 above as if fully set forth herein.

259.   As set forth above, Defendants violated O.C.G.A. § 16-8-4 (theft by conversion) and O.C.G.A. § 16-8-3 (theft by deception/fraudulent misrepresentation).

260.   Defendants violated O.C.G.A. § 16-8-4  and O.C.G.A. § 16-8-3 in furtherance of a scheme to convert Plaintiffs' funds and equity ownership to their personal use.

261.   Defendants' unlawful actions constitute a pattern of racketeering activity under O.C.G.A. § 16-14-4.

262.   Defendants derived financial rewards from their racketeering activity and scheme in the form of cash proceeds or other benefits in violation of O.C.G.A. § 16-14-4.

263.   Plaintiffs have suffered and will continue to suffer damages as a proximate cause of Defendants' actions.

264.   Pursuant to O.C.G.A. § 16-14-6, Defendants are liable to Plaintiffs for three times the actual damages they caused and also for Plaintiffs' attorneys' fees and costs of investigation and litigation.

265.   Defendants are also liable for punitive damages because they acted willfully, maliciously and intentionally.

## COUNT IX: CIVIL CONSPIRACY

266.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 265 above as if fully set forth herein.

267.   Two or more Defendants, acting in concert, committed at least one of the above torts in furtherance of a scheme to induce Plaintiffs to provide cash proceeds for personal use and financial and other benefits to Defendants.

268.   Plaintiffs have suffered and will continue to suffer damages as a proximate

cause of Defendants' actions.

## COUNT X: DECLARATORY JUDGMENT

269.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 268

above as if fully set forth herein.

270.   A justiciable controversy exists as to whether Plaintiffs may remove Emily

Fu from her role as Manager "for cause" or otherwise.

271.   Plaintiffs seek a declaration that Emily Fu's conduct, including converting

Plaintiffs' funds provided for the purchase of commercial real estate to her

personal use; embezzling and spending money from the entities' bank

accounts for personal use; and obtaining unauthorized loans in certain

entities names and converting the proceeds of those loans to personal use,

constitutes "cause" authorizing her dismissal.

272.   In particular, Plaintiffs seek and are entitled to a declaration that (i) Emily

Fu's actions constitute fraud and misappropriation of funds committed in her

capacity as Manager and that such actions have had a material adverse effect

on each of the Plaintiffs for which she serves as Manager; and (ii) Emily

Fu's conduct as described herein constitutes a repeated and continuing failure to perform or comply with material obligations under the operating agreements of the Plaintiffs for which she serves as Manager, which she has not corrected after having more than 30-days' written notice to do so.

## COUNT XI:  EQUITABLE REFORMATION AND OTHER EQUITABLE RELIEF

273.  Plaintiffs incorporate the allegations contained in Paragraphs 1 through 272 above as if fully set forth herein.

274.  The Capital Investment Defendants fraudulently induced the installation of Emily Fu as Manager of Intelligent, Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, and Eastside Med with expansive, unchecked powers.

275.  Defendants have exploited and are continuing to exploit Emily Fu's wrongly acquired powers as Manager in ways that are working and will continue to work irreparable harm on these entities.

276.  Having fraudulently obtained Emily Fu's position as Manager, Defendants are persisting in their wrongful conduct to retain her in that position with

respect to Johns Creek, Windward Market, Palisades, Peachtree Med, and Eastside Med (the "Count XI Plaintiffs").

277.   There is no adequate remedy at law for the injuries the Count XI Plaintiffs are suffering as the consequence of Emily Fu's continuing position as their Manager despite having been caught misappropriating their funds, among other wrongful acts.

278.   The Count XI Plaintiffs seek and are entitled to equitable orders sufficient to do complete justice and provide them complete relief from the ongoing harms pursuant to O.C.G.A. §§ 23-1-7; 23-1-8, 23-1-12, including removing Emily Fu as their Manager.

279.   In addition, or alternatively, the Count XI Plaintiffs are entitled to have their operating agreements equitably reformed so that each operating agreement allows removal and replacement of the Manager by members owning a combined majority interest in the company, for which purpose Defendants or the parties who did not contribute initial capital to the respective entities shall not be counted as "Members," and their consent to the reformation shall not be required.

280. In addition, the respective operating agreements should be reformed to allow a majority of the Members who contributed capital to the respective entities to act on certain matters on behalf of those entities, including bringing suit on behalf of the entities.

281. In addition, the operating agreements of Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, and Eastside Med should be reformed to remove any Member that did not contribute initial capital to the respective entities.

282. In addition, or alternatively, the Court should grant whatever additional equitable relief is shown by the evidence to be necessary or warranted to protect any of the Plaintiffs.

## COUNT XII:  INJUNCTIVE RELIEF

283. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 282 above as if fully set forth herein.

284. Plaintiffs are suffering harm and will continue to suffer irreparable harm as a result of Defendants' conduct.  Temporary, preliminary, and permanent injunctions are therefore necessary to prevent this harm.

285.   The balance of the equities and public policy favor granting an injunction.

286.   The Count XI Plaintiffs therefore seek a temporary restraining order and preliminary injunction allowing them to (i) suspend Defendant Emily Fu as their Manager and from any other capacity related to the entities, and bar her from exercising any of the authority, rights, powers, duties, and obligations attendant on such positions; and (ii) appoint one or more interim Managers by the procedures specified in their respective operating agreements, except that, for purposes of such appointment, the Fu-related members and the members who did not contribute initial capital to the respective entities shall not be counted as "Members" of Plaintiffs, and their consent to the appointment shall not be required.

## COUNT XIII:  PUNITIVE DAMAGES (O.C.G.A. § 51-12-5.1(f))

287.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 286 above as if fully stated herein.

288.   Defendants engaged in willful, malicious and intentional conduct, all with the specific purpose of injuring Plaintiffs and are therefore liable to Plaintiffs for punitive damages in accordance with O.C.G.A. § 51-12-5.1(f).

## COUNT XIV:  ATTORNEYS' FEES (O.C.G.A. § 13-6-11)

289.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 288 above as if fully stated herein.

290.   Defendants acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.  As a result, Plaintiffs are entitled to an award of their litigation expenses, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

291.   Plaintiffs are also entitled to an award of their attorneys' fees pursuant to O.C.G.A. § 16-14-6 and 18 U.S.C. § 1962(c) for the reasons set forth above.

THEREFORE, Plaintiffs respectfully pray that:

a.   A trial by jury be had on all issues in this case;

b.   Plaintiffs be awarded actual, treble, and punitive damages as allowed by law;

c.   Defendants' purported membership interest in Plaintiffs, if any, be divested as provided under the Federal and Georgia RICO statutes;

d.   Plaintiffs be awarded prejudgment interest as allowed by law;

e.  Plaintiffs' attorneys' fees and costs be taxed against Defendants; and

f.  Plaintiffs be granted such other relief as the Court deems just and appropriate.

Dated:       December 20, 2017

Respectfully submitted,

JONES DAY

/s/ Jennifer Bunting-Graden
Jamila M. Hall
  (Ga. Bar No. 319053)
  jhall@jonesday.com
Jennifer Bunting-Graden
  (Ga. Bar No. 188520)
  jbuntinggraden@jonesday.com
Natalie Williams
  (Ga. Bar No. 622660)
  nwilliams@jonesday.com

JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, GA  30309-3053
Telephone:  (404) 521-3939
Facsimile:   (404) 581-8330

*Attorneys for Plaintiffs*

## <u>LOCAL RULE 5.1 CERTIFICATION</u>

I hereby certify that the foregoing COMPLAINT FOR DAMAGES AND EQUITABLE AND INJUNCTIVE RELIEF has been prepared in Times New Roman 14 point font in accordance with Local Rule 5.1.

Dated: December 20, 2017                    Respectfully submitted,


JONES DAY


/s/ Jennifer Bunting-Graden_____

Jennifer Bunting-Graden