## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

INTELLIGENT INVESTMENT
INTERNATIONAL LLC, BRANNON
CROSSING PARTNERS LLC, WALKS
AT JOHNS CREEK PARTNERS LLC,
WINDWARD MARKET FOREST
LLC, PALISADES WEST PACES
PARTNERS LLC, GII SPALDING
PLAZA LLC, COOPER VILLAGE
PARTNERS LLC, PEACHTREE MED
BUILDING PARTNERS LLC,
EASTSIDE MED PARTNERS LLC,

     Plaintiffs,

v.

EMILY FU, CAPITAL INVESTMENT
INTERNATIONAL, INC., JACOB FU,
JOSHUA FU, NINA XU,
TOUCHMARK NATIONAL BANK

     Defendants.

Civil Action No.

1:17-cv-05296-RWS

## FIRST AMENDED COMPLAINT FOR DAMAGES
## AND EQUITABLE AND INJUNCTIVE RELIEF

    In accordance with Fed. R. Civ. P. 15(a) and before any responsive

pleadings have been filed by any Defendant (*see Coventry First, LLC v. McCarty,*

605 F.3d 865, 869 (11th Cir. 2010)), Plaintiffs Intelligent Investment International LLC, Brannon Crossing Partners LLC, Walks at Johns Creek Partners LLC, Windward Market Forest LLC, Palisades West Paces Partners LLC, GII Spalding Plaza LLC, Cooper Village Partners LLC, Peachtree Med Building Partners LLC, Eastside Med Partners LLC (collectively "Plaintiffs") file this First Amended Complaint to (1) clarify certain allegations and claims asserted in their initial complaint; and (2) add Touchmark National Bank as a defendant and assert claims against it.

I.  PARTIES, JURISDICTION, AND VENUE .................................................5

II. FACTUAL BACKGROUND ..........................................................................8

   A.  BACKGROUND ...................................................................................8

   B.  COMMERCIAL REAL ESTATE INVESTMENTS ...............................11

       1.  Intelligent Investment International LLC ...............................12

       2.  Brannon Crossing Partners LLC .............................................16

       3.  Walks at Johns Creek Partners LLC .......................................19

       4.  Windward Market Forest LLC .................................................24

       5.  Palisades West Paces Partners LLC ........................................29

       6.  GII Spalding Plaza LLC .........................................................34

       7.  Cooper Village Partners LLC ..................................................37

       8.  Peachtree Med Building Partners LLC ....................................42

       9.  Eastside Med Partners LLC .....................................................47

   C.  MISAPPROPRIATION OF ASSETS ....................................................51

       1.  Personal Use of Company Funds ............................................52

       2.  Unauthorized Loans ................................................................54

          a.  The Shoppes at Brannon .................................................55

          b.  Spalding Plaza ................................................................60

       3.  Ghost Properties .....................................................................64

          a.  Sugarloaf Center .............................................................64

          b.  North Atlanta Primary Care ...........................................66

          c.  Eastside Building ............................................................68

       4.  Purchase Price Discrepancies .................................................69

          a.  Market Forest Shops .......................................................69

          b.  Cooper Retail Center .......................................................70

          c.  Peachtree Corners ...........................................................71

**5.    Other Improper Use of Company Funds** ..............................................71

**D.   DAMAGES** ..............................................................................................72

**1.    Business Interruption** ..........................................................................73

**2.    Money and Other Damages** ..................................................................75

**III. CAUSES OF ACTION** ................................................................................76

COUNT I:  FEDERAL RICO (18 U.S.C. § 1962(c)) ....................................76

COUNT II:  FEDERAL RICO (18 U.S.C. § 1962(d)) ...................................79

COUNT III:  CONVERSION ...........................................................................80

COUNT IV:  FRAUDULENT MISREPRESENTATION ...............................82

COUNT V:  BREACH OF FIDUCIARY DUTY ............................................83

COUNT VI:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY 84

COUNT VII:  MONEY HAD AND RECEIVED ............................................85

COUNT VIII: GEORGIA RICO (O.C.G.A. § 16-14-4) ................................86

COUNT IX: DECLARATORY JUDGMENT ..................................................87

COUNT X:  EQUITABLE REFORMATION ..................................................88

AND OTHER EQUITABLE RELIEF ..............................................................88

COUNT XI:  NEGLIGENCE ............................................................................91

COUNT XII: CIVIL CONSPIRACY ...............................................................92

COUNT XIII:  QUIET TITLE O.C.G.A. § 23-3-40 ......................................92

COUNT XIV:  DECLARATORY JUDGMENT ..............................................94

COUNT XV:  INJUNCTIVE RELIEF .............................................................97

COUNT XVI:  PUNITIVE DAMAGES (O.C.G.A. § 51-12-5.1(f)) ...............98

COUNT XVII:  ATTORNEYS' FEES (O.C.G.A. § 13-6-11) ..........................98

## I.   <u>PARTIES, JURISDICTION, AND VENUE</u>

1.   Plaintiff Intelligent Investment International LLC ("Intelligent") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

2.   Plaintiff Brannon Crossing Partners LLC ("Brannon Crossing") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

3.   Plaintiff Walks at Johns Creek Partners LLC ("Johns Creek") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

4.   Plaintiff Windward Market Forest LLC ("Windward Market") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

5.   Plaintiff Palisades West Paces Partners LLC ("Palisades") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

6.   Plaintiff GII Spalding Plaza LLC ("GII Spalding") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

7.   Plaintiff Cooper Village Partners LLC ("Cooper Village") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

8.   Plaintiff Peachtree Med Building Partners LLC ("Peachtree Med") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

9.   Plaintiff Eastside Med Partners LLC ("Eastside Med") is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

10.  Defendant Emily Fu is an individual residing in Gwinnett County, Georgia. Emily Fu is subject to this Court's personal jurisdiction.

11.  Defendant Capital Investment International, Inc. ("Capital Investment") is a Georgia corporation with its principal place of business at 1300 Peachtree Industrial Blvd., Suite 3209, Suwanee, GA, Gwinnett County, 30024. Capital Investment is subject to this Court's personal jurisdiction.

12.    Defendant Jacob Fu is an individual residing in Gwinnett County.  Jacob Fu
       is subject to this Court's personal jurisdiction.

13.    Defendant Joshua Fu is an individual residing in Gwinnett County.  Joshua
       Fu is subject to this Court's personal jurisdiction.

14.    On information and belief, Defendant Nina Xu (also known as Liu Xu) is an
       individual residing in Georgia and is therefore subject to this Court's
       personal jurisdiction.

15.    Defendant Touchmark National Bank ("Touchmark") is a national banking
       association chartered under the laws of the United States of America with its
       principal place of business at 3651 Old Milton Parkway, Alpharetta, GA,
       30005.  Touchmark is subject to this Court's personal jurisdiction.

16.    This Court has subject matter jurisdiction over this action pursuant to 18
       U.S.C. § 1964, , 28 U.S.C. § 1331, and 28 U.S.C. § 1367.  This Court has
       pendent jurisdiction over the claims asserted against Touchmark.

17.    Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28
       U.S.C. § 1391 because, among other reasons, Defendants Emily Fu, Jacob
       Fu, Joshua Fu are subject to personal jurisdiction in this judicial district and

reside in this district.  Also, this is a judicial district in which a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred.

18.  Based on the allegations in Paragraphs 1 through 16, jurisdiction and venue are proper in this Court.

19.  All conditions precedent, if any, to the claims and causes of action asserted herein have been satisfied or waived.

## II.  FACTUAL BACKGROUND

### A.  BACKGROUND

20.  Wanjiong Lin is the Founder and Chairman of Self China, an LED technology and manufacturing company headquartered in Ningbo, China. Self China is a global corporation with locations in Ningbo and Shenzhen, China; Cologne, Germany; and the United States.

21.  Self China owns two Georgia corporations that manage U.S. real estate holdings and investments, Ninglanta Industry, Inc. ("Ninglanta") and Goldenfield Industry, Inc. (d/b/a Goldenfield Investment, Inc.) ("Goldenfield").  Kaiyou Lin, Wanjiong Lin's son, currently serves as Vice President of Ninglanta and President of Goldenfield.

22. In or around 2011, a family friend introduced Wanjiong Lin to Emily Fu, a licensed realtor.  Emily Fu served as Wanjiong Lin's realtor with respect to the purchase of two residential properties and, over the course of the next six years, insinuated herself into the good graces of the Lin family.

23. On information and belief, Emily Fu is the sole owner of Capital Investment. Capital Investment purports to be an investment and advisory firm, which, among other things, holds itself out as working with high net-worth individuals, many of them in China, to secure commercial real estate for investment purposes.

24. Until November 13, 2017, Nina Xu was CEO of Capital Investment, and Emily Fu's sons, Jacob Fu and Joshua Fu (the "Fu Sons"), served as the company's Secretary/CFO and registered agent, respectively.

25. Nina Xu was responsible for asset management and property development at Capital Investment.  She reported directly to Emily Fu.  Capital Investment touted Nina Xu's prior experience as the Chairman of a "mega" real estate company in China with allegedly more than $6 billion in assets, and her general experience in developing and managing commercial and residential real estate.

26.    On information and belief, the Fu Sons, along with Nina Xu, participated in the management of the company and/or the management of investment properties on behalf of Capital Investment's clients.

27.    On information and belief, the Fu Sons and Nina Xu each had knowledge of Emily Fu's and Capital Investment's transactions with investors, including the investments involving the Plaintiffs in this action.  As set out below, the Fu Sons, themselves, participated in certain investment projects.

28.    Emily Fu, Capital Investment, and the Fu Sons were also direct beneficiaries of transactions with the company's clients, including Plaintiffs, in that each was assigned an ownership percentage of certain companies under management, purportedly in exchange for contributed initial capital. Nevertheless, each received or agreed to receive income/profit sharing distributions based on their purported ownership percentage of the respective companies, even though they failed to pay for those ownership interests.

29.    On November 13, 2017, Capital Investment's annual registration with the Georgia Secretary of State was amended to remove the Fu sons and Nina Xu as officers and to establish Emily Fu as CEO, Secretary, and Registered Agent and Rory Strong as CFO.  The fact remains, however, that (i) Jacob

Fu was CEO and CFO of Capital Investment from 2011 to 2014 and CFO from 2011 to 2017; (ii) Joshua Fu was the company's registered agent from 2011 to 2017; and (iii) Nina Xu served as CEO beginning in 2014.  Thus, the Fu Sons and Nina Xu collectively served as officers and/or actively participated in the management of Capital Investment during the transactions described in this Complaint.

## B.    COMMERCIAL REAL ESTATE INVESTMENTS

30.    In or around 2014, Wanjiong Lin told Emily Fu that he was interested in investing in commercial real estate in the United States, and Emily Fu offered her services and that of her company, Capital Investment, to assist with the purchase of real estate and to manage the properties.

31.    Emily Fu represented to Wanjiong Lin and Kaiyou Lin (collectively the "Lins") that she handled and managed similar investments for other high net worth individuals based in China.  As a result, the Lins introduced Emily Fu to some of their friends and family members in China who were similarly interested in investing in commercial real estate in the United States.

32.    Between the middle of 2014 and early 2017, Emily Fu created investment prospectuses for, marketed, and recommended numerous commercial real

estate properties to Ninglanta, Goldenfield, the Lins, and other investors

based in China.  As a direct result of Emily Lu's marketing efforts, the Lins,

together with their friends and family members (collectively the "Lin

Investors"), invested in nine properties.  Kaiyou Lin sometimes served as the

liaison between the Lin Investors and Emily Fu, but Emily Fu also

communicated directly with individual investors.

### 1.     Intelligent Investment International LLC

33.     In or around May 2014, Emily Fu, on behalf of Capital Investment, sent an

investment prospectus to potential investors, including to Wanjiong Lin by

email, describing the Shoppes at Mall of Georgia ("Mall of Georgia"),

located at 2815 Buford Drive, Buford, GA.  The prospectus bore Capital

Investment's logo on each page and provided information regarding the

property, including location information, existing tenants, a proposed

purchase price of $3,800,000, and an expected rate of return of 8.5% per

year.  The purpose of the prospectus was to convince investors to contribute

capital to purchase the Mall of Georgia.

34.     Emily Fu took potential investors and/or their representatives, Luyong Li,

Kaiyou Lin, and Jieyong Cao, on a tour of the Mall of Georgia and

represented to them that it was a good investment.  She told them she would handle all aspects of the transaction, including acting as broker; recommending and engaging legal and other advisors; coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold the Mall of Georgia.

35.   In or around September 2014, five individual investors, Wengang Yu, Kaiyou Lin, Deyin Li, Yi Wang, and Sigang Zhang, established Plaintiff Intelligent Investment International LLC ("Intelligent").  The purpose of Intelligent was to purchase and hold for investment the Mall of Georgia.

36.   Emily Fu told the Intelligent members that an attorney had drafted the operating agreement, and it named her Manager of the company.  As Manager, Emily Fu gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of [Intelligent]."  Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed only by unanimous consent of the members.

37.   The Intelligent members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the

operating agreement was acting in their collective interests.  They also justifiably trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

38.   As set forth in the Intelligent operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| W. Yu | $586,500 |
| K. Lin | $703,800 |
| D. Li | $351,900 |
| Y. Wang | $117,300 |
| S. Zhang | $586,500 |
| Total Initial Contribution | $2,346,000 |

39.   Emily Fu used a Capital Investment bank account to receive the Intelligent members' payment of earnest money for the purchase of Mall of Georgia.

40.   Emily Fu opened a bank account in the name of Intelligent at Touchmark, and, in or about August 2014, provided wiring information by email to Kaiyou Lin to be distributed to the other members, instructing them to wire money from China into the Intelligent bank account.  The funds represented each investor's initial capital contribution to Intelligent and were for the express and sole purpose of purchasing the Mall of Georgia.

41.  In or about September 2014, the Intelligent members caused funds in payment of their initial capital contribution to be wired from Hong Kong into the Intelligent bank account as instructed by Emily Fu.

42.  On or around September 17, 2014, Emily Fu sent Kaiyou Lin what purported to be a closing statement for the purchase of the Mall of Georgia to be distributed to the Intelligent members.  The statement reflected that Intelligent would purchase the Mall of Georgia for a total of $3,800,000, paid via cash and a loan from Touchmark in the amount of $1,900,000.

43.  As Manager with expansive powers, Emily Fu had sole and full control of Intelligent.  Emily Fu reported that she and Capital Investment assisted with the management of the Mall of Georgia property, including overseeing the collection of rents and the payment of operating expenses.  She emailed Intelligent members, including Kaiyou Lin, periodic financial statements for the Mall of Georgia operations, which reflected income from the property and operating expenses and indicated that it was profitable.

44.  Emily Fu also transmitted financial data by email to Intelligent's accountants for tax preparation purposes and prepared and periodically emailed members

an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

45.    Her most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017.  She indicated in the worksheet that 10% of each foreign member's distribution was being withheld for tax purposes, but on information and belief, such withholdings were not paid to the Internal Revenue Service ("IRS").

46.    Between July 8, 2015 and March 12, 2016, Emily Fu communicated repeatedly with Intelligent members via group chats on the WeChat[1] app. She used the electronic chat room to update the members with information regarding their investment, including by providing images of financial reports.

### 2.    Brannon Crossing Partners LLC

47.    In or around March 27, 2014, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to Ninglanta by email describing the Shoppes at Brannon Crossing ("Shoppes at Brannon"), located at 405 Peachtree

---

[1] WeChat is a Chinese messaging app.

Parkway, Cumming, GA.  The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including location information, existing tenants, purchase price of $15,000,000, and an expected capitalization rate of 8% a year.  The purpose of the prospectus was to convince Ninglanta to contribute capital to purchase the Shoppes at Brannon.

48.  Emily Fu took Wanjiong Lin, Luyong Li, and Jieyong Cao, representatives of Ninglanta, on a tour of the Shoppes at Brannon and represented to them that it was a good investment.  She promised to handle all aspects of the transaction, including acting as broker; recommending and engaging legal and other advisors; and coordinating third party services, including environment and property appraisals.

49.  In or around October  2014, Ninglanta, established Plaintiff Brannon Crossing Partners LLC  ("Brannon Crossing") as its sole member, and named Yi Wang as its Manager.  Emily Fu was neither named an officer of Brannon Crossing nor authorized to take action on behalf of the company. The express purpose of Brannon Crossing was to purchase and hold for investment the Shoppes at Brannon.

50.  Emily Fu assisted Ninglanta with opening a bank account at Bank of America and provided wiring information to Ninglanta, instructing it to wire money into the Brannon Crossing bank account.  The sole purpose of the funds was to purchase the Shoppes at Brannon.

51.  In or about July to October 2014, in accordance with Emily Fu's instructions, Ninglanta caused a total of $15,000,000 to be wired into the Brannon Crossing bank account.

52.  On or around October 10, 2014, Emily Fu emailed Ninglanta what purported to be a closing statement for the purchase of the Shoppes at Brannon.  The statement reflected that Brannon Crossing had purchased the Shoppes at Brannon for $15,000,000 in an all cash transaction.

53.  Emily Fu and Capital Investment purportedly assisted with the management of the Shoppes at Brannon property, including overseeing the collection of rent and payment of operating expenses.

54.   Emily Fu uploaded to Dropbox[2] periodic financial statement packages
      prepared by the Shoppes at Brannon property manager.  The package
      included income statements, balance sheets, aging reports, bank statements,
      bank reconciliations, rent rolls, and general ledger account statements.  The
      documents indicated that Shoppes at Brannon was a profitable investment
      and did not show any mortgage outstanding on the property.

55.   Emily Fu also transmitted financial data by email to the Brannon Crossing
      accountants for tax preparation purposes.  This data similarly did not
      indicate that there was any mortgage on the property.

### 3.   Walks at Johns Creek Partners LLC

56.   In or around January 2015, Emily Fu, on behalf of Capital Investment, took
      potential investors Wanjiong Lin, Tan-Yu Lee, and Anni Lee on a tour of the
      Walks at Johns Creek shopping center ("Walks") located at 11030 & 11035
      Medlock Bridge Road, Johns Creek, GA.  The purpose of the tour was to
      convince the investors to invest in and contribute capital to purchase the
      Walks.

---

[2] Dropbox is a file hosting service.

57. Emily Fu told these individuals that she would take a majority position in the project, and handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors; coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold the Walks.

58. In or around February 2015, five individual investors, Jacob Fu, Larina Hsiu-Lan Lin, Wanjiong Lin, Tan-Yu Lee, and Anni Lee, established Plaintiff Walks at Johns Creek Partners LLC ("Johns Creek"). The sole purpose of Johns Creek was to purchase and hold the Walks.

59. Emily Fu represented to the Johns Creek members that an attorney drafted the operating agreement, which named Emily Fu the Manager of Johns Creek. As Manager, Emily Fu gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of the [Johns Creek]." Under the operating agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be only removed as Manager by unanimous consent of the Johns Creek members, which could never happen because she or one of her associates is a member of the company.

60. The Johns Creek members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the operating agreement was acting in their collective interests.  They also justifiably trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of Johns Creek.

61. As set forth in the Johns Creek operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| Jacob Fu | $1,710,354 |
| T. Lee | $624,937 |
| L. Lin | $411,143 |
| W. Lin | $542,709 |
| Total Initial Contribution | $3,289,143 |

62. Emily Fu used a Capital Investment bank account to receive the Johns Creek members' payment of earnest money for the purchase of the Walks.

63. Emily Fu opened a bank account in the name of Johns Creek at Touchmark, and, in or about January 2015, provided wiring information to Wanjiong Lin and other members by WeChat and other methods, instructing them to wire money from China into the Johns Creek bank account at Touchmark.  The

funds represented each investor's initial capital contribution to Johns Creek and were for the express and sole purpose of purchasing the Walks.

64.    In or about January 2015, in accordance with Emily Fu's instructions, the Johns Creek members caused funds in payment of their initial capital contribution to be deposited into the Johns Creek bank account at Touchmark.

65.    On information and belief, Jacob Fu, Emily Fu's son and accomplice, did not wire money into the Johns Creek bank account, nor did he otherwise contribute initial capital to Johns Creek.  Emily Fu withheld that information from the non-related members.

66.    Emily Fu subsequently informed the non-related Johns Creek members that she would purchase another property, the Sugarloaf Center, located at 1950 Satellite Blvd., Duluth, GA (the "Sugarloaf Center"), instead.

67.    On or around April 27, 2015, Emily Fu emailed the non-related Johns Creek members what purported to be a closing statement for the purchase of the Sugarloaf Center.  The statement reflected that Johns Creek would purchase the Sugarloaf Center for $3,250,000 in an all cash transaction.  The

statement was purportedly signed by the seller and Emily Fu, as Manager of Johns Creek.

68.    As Manager with expansive powers, Emily Fu had sole and full control of Johns Creek.  Emily Fu reported that she and Capital Investment assisted with the management of the Sugarloaf Center, including overseeing the collection of rents and payment of operating expenses.  She emailed Johns Creek members, including Kaiyou Lin, purported periodic financial statements for the Sugarloaf Center, which reflected income from the property and operating expenses and indicated that it was profitable.

69.    Emily Fu also transmitted financial data by email to Johns Creek's accountants for tax preparation purposes and prepared and periodically emailed members an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

70.    Emily Fu's most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages and profit distribution even for Jacob Fu, who, on information and belief, did not contribute any capital to Johns Creek.  She indicated in the worksheet that 10% of each foreign member's distribution was being withheld for tax

purposes, but on information and belief, such withholdings were not paid to the IRS.

71. On information and belief, Jacob Fu received profit distributions to which he was not entitled.

### 4.   Windward Market Forest LLC

72. In or around June 5, 2015, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to investors residing in China, including to Kaiyou Lin by email, describing the Market Forest Shops, located at 6195 Windward Pkwy, Alpharetta, GA.  The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including location information, existing tenants, a proposed purchase price of $3,900,000, and an expected rate of return of 7.5% per year.  The purpose of the prospectus was to convince the investors to contribute capital to purchase Market Forest Shops.

73. Emily Fu took Tan-Yu Lee, a representative of potential investors, on a tour of Market Forest Shops and represented to him that it was a good investment.  She told him she would handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors;

coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold Market Forest Shops.

74.     In or around August 2015, six investors, Yu Shi, Jiang Bian, Fangfang Guo, Kaiyou Lin, Deyin Li, and Capital Investment, established Plaintiff Windward Market Forest LLC ("Windward Market").  The express and sole purpose of Windward Market was to purchase and hold Market Forest Shops.

75.     Emily Fu told the Windward Market members that an attorney drafted the operating agreement, and it named her Manager of the company.  As Manager, Emily Fu gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of the [Windward Market]."  Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed as Manager only by unanimous consent of the members, which could never happen because she or one of her associates is a member of the company.

76.   The Windward Market members are Chinese nationals whose first language

is not English, and they believed the attorney who supposedly drafted the

agreement was acting in their interests.  They also justifiably trusted Emily

Fu and did not understand that the terms of the operating agreement

disproportionately favored the Manager and gave her sole authority to act on

behalf of the company.

77.   As set forth in the Windward Market operating agreement, each investor's

contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| Y. Shi | $456,681 |
| J. Bian | $456,681 |
| F. Guo | $456,681 |
| K. Lin | $456,681 |
| D. Li | $342,511 |
| Capital Investments | $114,170 |
| Total Initial Contribution | $2,283,405 |

78.   Emily Fu used a Capital Investment bank account to receive the Windward

Market members' payment of earnest money for the purchase of Market

Forest Shops.

79.   Emily Fu opened a bank account in the name of Windward Market at

Touchmark, and, on or about August 18, 2015, provided wiring information

by WeChat to Kaiyou Lin to be distributed to the other members, instructing them to wire money from China into the Windward Market bank account. The funds represented each investor's initial capital contribution to Windward Market and were for the express and sole purpose of purchasing Market Forest Shops.

80.   In or about August 20, 2015, in accordance with Emily Fu's instructions, Windward Market members caused funds in payment of their initial capital contribution to be wired from China and Hong Kong into the Windward Market bank account.

81.   On information and belief, Capital Investment, Emily Fu's company and accomplice, did not wire money into the Windward Market bank account or otherwise contribute initial capital to Windward Market.  Emily Fu withheld that information from the non-related members.

82.   On or around October 28, 2015, Emily Fu sent Kaiyou Lin what purported to be a closing statement for the purchase of Market Forest Shops to be distributed to the non-related Windward Market members.  The statement reflected that Windward Market would purchase Market Forest Shops for a

total of $3,900,000, paid via cash and a loan from Touchmark in the amount of $1,950,000.

83.    As Manager with expansive powers, Emily Fu had sole and full control of Windward Market.  Emily Fu reported that she and Capital Investment assisted with the management of Market Forest Shops, including overseeing the collection of rent and payment of operating expenses.  She emailed Windward Market members, including Kaiyou Lin, periodic financial statements for Market Forest Shops, which reflected income from the property and operating expenses and indicated that it was profitable.

84.    Emily Fu also transmitted financial data by email to Windward Market's accountants for tax preparation purposes and prepared and periodically emailed members an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

85.    Emily FU's most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages and profit distribution even for Capital Investment, which, on information and belief, did not contribute any capital to Windward Market.  She also indicated in the worksheet that 10% of each foreign member's distribution

was being withheld for tax purposes, but on information and belief, such withholdings were not paid to the IRS.

86. On information and belief, Capital Investment received profit distributions to which it was not entitled.

87. Between July 6, 2015 and June 3, 2016, Emily Fu communicated repeatedly with Windward Market members via group chats on the WeChat app. She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### 5. Palisades West Paces Partners LLC

88. On or around February 14, 2016, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to investors residing in China, including to Kaiyou Lin by WeChat, describing the North Atlanta Primary Care condominium ("North Atlanta Primary Care"), located at 3200 Downwood Circle, Unit 200, Atlanta, GA. The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including location information, existing tenants, a proposed purchase price of $1,450,000, and an expected rate of return of 7.7% per year. The purpose

of the prospectus was to convince the investors to contribute capital to purchase North Atlanta Primary Care.

89. Emily Fu took a representative of potential investors, Jieyong Cao, on a tour of North Atlanta Primary Care and told him that it was a good investment. She promised to handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors; coordinating third party services, including environment and property appraisals; and serving as manager of the LLC that would hold North Atlanta Primary Care.

90. In or around March 2016, four individual investors, ChenChao Wang, Kaiyou Lin, Fangfang Guo, and Joshua Fu, established Plaintiff Palisades West Paces Partners LLC ("Palisades").  The express and sole purpose of Palisades was to purchase and hold North Atlanta Primary Care.

91. Emily Fu told the Palisades members that an attorney drafted the operating agreement, which named her the Manager of the company.  As Manager, Emily Fu gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of the [Palisades]."  Under the operating agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu

could be removed as Manager only by unanimous consent of the members, which could never happen because she or one of her associates is a member of the company.

92.    The Palisades members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests.  They also justifiably trusted Emily Fu and did not understand that the terms of the operating agreement disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

93.    As set forth in the Palisades operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| C. Wang | $459,167 |
| K. Lin | $459,167 |
| F. Guo | $459,167 |
| Joshua Fu | $72,500 |
| Total Initial Contribution | $1,450,001 |

94.    Emily Fu used a Capital Investment bank account to receive the Palisades members' payment of earnest money for the purchase of North Atlanta Primary Care.

95.   Emily Fu opened a bank account in the name of Palisades at Metro City
      Bank, and, in or about March 27, 2016, provided wiring information by
      WeChat to ChenChao Wang, Kaiyou Lin, and Fangfang Guo, instructing
      them to wire money from China into the bank account.  The funds
      represented each investor's initial capital contribution to Palisades and were
      for the purpose of purchasing North Atlanta Primary Care.

96.   In or about March 2016, the Palisades members caused funds in payment of
      their initial capital contribution to be wired from China and Hong Kong into
      the Palisades bank account as instructed by Emily Fu.

97.   On information and belief, Joshua Fu, Emily Fu's son and accomplice, did
      not wire money into the Palisades bank account or otherwise contribute
      initial capital to Palisades.  Emily Fu withheld that information from the
      non-related members.

98.   On or around April 15, 2016, Emily Fu sent Kaiyou Lin by WeChat what
      purported to be a closing statement for the purchase of North Atlanta
      Primary Care.  The statement reflected that Palisades would purchase North
      Atlanta Primary Care for $1,450,000 in an all cash transaction.  The

statement purportedly bore the signature of the seller and Emily Fu as Manager of Palisades.

99.   As Manager with expansive powers, Emily Fu had sole and full control of Palisades.  Emily Fu reported that she and Capital Investment assisted with the management of North Atlanta Primary Care, including overseeing the collection of rent and payment of operating expenses.  She emailed Palisades members, including Kaiyou Lin, purported periodic financial statements for North Atlanta Primary Care, which reflected income from the property and operating expenses and indicated that it was profitable.

100.   Emily Fu also transmitted financial data by email to Palisades' accountants for tax preparation purposes and prepared and periodically emailed members an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

101.   Her most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages and profit distribution even for Joshua Fu, who, on information and belief, did not contribute any capital to Palisades.  She indicated in the worksheet that 10% of each foreign member's distribution was being withheld for tax

purposes, but on information and belief, such withholdings were not paid to the IRS.

102.    On information and belief, Joshua Fu received profit distributions to which he was not entitled.

103.    Between March 12, 2016 and May 27, 2016, Emily Fu communicated repeatedly with Palisades members via group chats on the WeChat app.  She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### 6.    GII Spalding Plaza LLC

104.    On or around January 23, 2016, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to representatives of Goldenfield by email describing the Spalding Plaza shopping center ("Spalding Plaza"), located at 6470 Spalding Drive, Norcross, GA.  The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including location information, existing tenants, a proposed purchase price of $5,195,000, and a capitalization rate of 8.33% per year. The purpose of the prospectus was to convince the investors to contribute capital to purchase the Spalding Plaza.

105.   Emily Fu took Wanjiong Lin, Kaiyou Lin, Jieyong Cao, and Yi Wang,
       representatives of Goldenfield, on a tour of Spalding Plaza and represented
       to them that it was a good investment.  She promised to handle all aspects of
       the transaction, including acting as broker; and coordinating third party
       services, including environment and property appraisals.

106.   In or around June 2016, Goldenfield established Plaintiff GII Spalding Plaza
       LLC  ("GII Spalding") as its sole member, and named Yi Wang as Manager.
       Emily Fu was named the Executive Vice President, but was expressly
       prohibited from taking certain actions, including "obligat[ing] the Company
       under any loan or commitment for any loan, refinance[ing] any loan or
       encumber[ing] any asset of the Company."  The express and sole purpose of
       GII Spalding was to purchase and hold for investment Spalding Plaza.

107.   Emily Fu opened a bank account in the name of the GII Spalding at Metro
       City Bank and subsequently added Yi Wang to the account.  Emily Fu
       instructed Goldenfield to deposit funds into the GII Spalding bank account
       for the purpose of purchasing Spalding Plaza.

108.  In or about May 2016, in accordance with Emily Fu's instructions, Goldenfield caused a total of $5,170,000 to be transferred into the GII Spalding bank account.

109.  On or around June 30, 2016, Emily Fu sent Goldenfield what purported to be a closing statement for the purchase of Spalding Plaza.  The statement reflected that GII Spalding had purchased Spalding Plaza for $5,150,000 in an all cash transaction.

110.  Emily Fu and Capital Investment purportedly assisted with the management of Spalding Plaza, including overseeing the collection of rents and payment of operating expenses.

111.  Emily Fu uploaded to Dropbox periodic financial statement packages prepared by the Spalding Plaza property manager.  The package included income statements, balance sheets, aging reports, bank statements, bank reconciliations, rent rolls, and general ledger statements.  The documents did not show that a mortgage was outstanding on Spalding Plaza and indicated that it was profitable.

112.    Emily Fu also transmitted financial data by email to GII Spalding's

accountants for tax preparation purposes.  These documents also did not

show that a mortgage was outstanding on the property.

### 7.    Cooper Village Partners LLC

113.    In or around May 2016, Emily Fu, on behalf of Capital Investment, sent an

investment prospectus to investors residing in China, including to Kaiyou

Lin by WeChat, describing the Cooper Village Retail Center ("Cooper Retail

Center"), located at 1132-1142 Athens Highway, Grayson, GA.  The

prospectus bore Capital Investment's logo on each page and provided

information regarding the property, including location information, existing

tenants, a proposed purchase price of $5,800,000, and an expected rate of

return of about 8% per year.  The purpose of the prospectus was to convince

the investors to contribute capital to purchase the Cooper Retail Center.

114.    Emily Fu took potential investors and/or their representatives, Wanjiong Lin,

Kaiyou Lin, and Tan-Yu Lee, on a tour of the Cooper Retail Center and

represented to them that it was a good investment.  She promised to handle

all aspects of the transaction, including acting as broker; recommending

lenders, legal and other advisors; coordinating third party services, including

environment and property appraisals; and serving as manager of the LLC that would hold the Cooper Retail Center.

115.   In or around May 2016, nine individual investors, Chang Yu, Wengang Yu, Kaiyou Lin, Qiongyang Li, Chenchao Wang, Wenling Zhao, Tan-Yu Lee, Anni Lee, and Emily Fu, established Plaintiff Cooper Village Partners LLC ("Cooper Village").  The sole and expressed purpose of Cooper Village was to purchase and hold the Cooper Retail Center.

116.   Emily Fu told the Cooper Village members that an attorney drafted the operating agreement, which named her the Manager of the company.  As Manager, Emily Fu gave herself broad powers, including "full and complete authority, power and discretion to manage and control the day-to-day business, affairs and properties of [ Cooper Village]."  Under the operating agreement, absent extraordinary circumstances, Emily Fu could be removed as Manager only by vote of 75% of the ownership interests in Cooper Village.

117.   The Cooper Village members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their collective interests.  They also justifiably

trusted Emily Fu and did not understand that the terms of the operating

agreement disproportionately favored the Manager and gave her sole

authority to act on behalf of the company.

118.   As set forth in the Cooper Retail Center operating agreement, each

investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| C. Yu | $1,046,095 |
| W. Yu | $538,431 |
| K. Lin | $538,431 |
| Q. Li | $276,908 |
| C. Wang | $276,908 |
| W. Zhao | $276,908 |
| T. Lee | $46,151 |
| A. Lee | $46,151 |
| Emily Fu | $30,768 |
| Total Initial Contribution | $3,076,751 |

119.   Emily Fu used a Capital Investment bank account to receive the Cooper

Village members' payment of earnest money for the purchase of the Cooper

Retail Center.

120.   Emily Fu opened a bank account in the name of Cooper Village at

Touchmark, and, in or about May 2016, provided wiring information by

WeChat to the members, instructing them to wire money from China into the

Cooper Village bank account.  The funds represented each investor's initial

capital contribution to Cooper Village and were for the purpose of

purchasing the Cooper Retail Center.

121. In or about May 2016, the Cooper Village members caused funds in

payment of their initial capital contribution to be wired from China into the

Cooper Village bank account as instructed by Emily Fu.

122. On information and belief, Emily Fu did not wire money into the Cooper

Village bank account or otherwise contribute initial capital to Cooper

Village.  Emily Fu withheld that information from the non-related members.

123. On or around July 27, 2016, Emily Fu sent Kaiyou Lin what purported to be

a closing statement for the purchase of the Cooper Retail Center to be

distributed to the Cooper Village members.  The statement reflected that

Cooper Village would purchase the Cooper Retail Center for a total of

$5,800,000, paid via cash and a loan from Touchmark in the amount of

$2,900,000.

124. As Manager with expansive powers, Emily Fu had sole and full control of

Cooper Village.  Emily Fu reported that she and Capital Investment assisted

with the management of the Cooper Retail Center property, including

overseeing the collection of rent and payment of operating expenses.  She

emailed Cooper Village members, including Kaiyou Lin, periodic financial

statements for the Cooper Retail Center, which reflected income from the

property and operating expenses and indicated that it was profitable.

125. Emily Fu also transmitted financial data by email to Cooper Village's

accountants for tax preparation purposes and prepared and periodically

emailed members an investor distribution worksheet showing the ownership

percentages and profit distribution for each member.

126. Emily Fu's most recent email providing distribution information was sent to

Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages

and profit distribution even for Emily Fu, who, on information and belief,

did not contribute any capital to Cooper Village.  She indicated in the

worksheet that 10% of each foreign member's distribution was being

withheld for tax purposes, but on information and belief, such withholdings

were not paid to the IRS.

127. On information and belief, Emily Fu received profit distributions to which

she was not entitled.

128. Between May 16, 2016 and October 29, 2016, Emily Fu communicated

repeatedly with Cooper Village members via group chats on the WeChat

app.  She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### 8.   Peachtree Med Building Partners LLC

129.   In or around March 2016, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to investors residing in China, including to Kaiyou Lin by WeChat, describing the Peachtree Corners Medical Building ("Peachtree Corners"), located at 3780 Holcomb Bridge Rd., Norcross, GA. The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including area information, tenants, a proposed purchase price of $1,850,000, and an expected rate of return of about 10.8% per year.  The purpose of the prospectus was to convince the investors to contribute capital to purchase Peachtree Corners.

130.   Emily Fu took Yi Wang, a representative of potential investors, on a tour of Peachtree Corners and represented to her that it was a good investment.  She promised to handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors; coordinating third party

services, including environment and property appraisals; and serving as manager of the LLC that would hold Peachtree Corners.

131. In or around May 2016, five individual investors, SiGang Zhang, Fang Han, Wenling Zhao, Kaiyou Lin, and Jacob Fu, established Plaintiff Peachtree Med Building Partners LLC ("Peachtree Med"). The sole purpose of Peachtree Med was to purchase and hold Peachtree Corners.

132. Emily Fu told the Peachtree Med members that an attorney drafted the operating agreement, and she was named Manager of the company. As Manager, she gave herself broad powers, including unlimited authority to conduct the business of the company. Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed as Manager only by unanimous consent of the members, which could never happen because she or one of her associates is a member of the company.

133. The Peachtree Med members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the agreement was acting in their interests. They also justifiably trusted Emily Fu and did not understand that the terms of the operating agreement

disproportionately favored the Manager and gave her sole authority to act on behalf of the company.

134.   As set forth in the Peachtree Med operating agreement, each investor's contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| S. Zhang | $372,242 |
| F. Han | $372,242 |
| W. Zhao | $273,708 |
| K. Lin | $32,845 |
| Jacob Fu | $43,793 |
| Total Initial Contribution | $1,094,830 |

135.   Emily Fu used a Capital Investment bank account to receive the Peachtree Med members' payment of earnest money for the purchase of Peachtree Corners.

136.   Emily Fu opened a bank account in the name of Peachtree Med at Touchmark, and, in or around May 5, 2016, provided wiring information by WeChat to Kaiyou Lin to be distributed to the other members, instructing them to wire money from China into the Peachtree Med bank account.  The funds were intended to represent each investor's initial capital contribution to Peachtree Med and were for the sole purpose of purchasing Peachtree Corners.

137. In or about May 2016, in accordance with Emily Fu's instructions, the Peachtree Med members caused funds in payment of their initial capital contribution to be wired from China into the Peachtree Med bank account.

138. On information and belief, Jacob Fu, Emily Fu's son and accomplice, did not wire money into the Peachtree Med bank account or otherwise contribute initial capital to Peachtree Med.  Emily Fu withheld that information from the non-related members.

139. On or around June 17, 2016, Emily Fu sent Peachtree Med investors by WeChat what purported to be a closing statement for the purchase of Peachtree Corners.  The statement reflected that Peachtree Med would purchase Peachtree Corners for a total of $1,850,000, paid via cash and a loan from Touchmark in the amount of $925,000.

140. As Manager with expansive powers, Emily Fu had sole and full control of Peachtree Med.  Emily Fu reported that she and Capital Investment assisted with the management of Peachtree Corners, including overseeing the collection of rent and payment of operating expenses.  She emailed Peachtree Med members, including Kaiyou Lin, periodic financial

statements for Peachtree Corners, which reflected income from the property and operating expenses and indicated that it was profitable.

141.   Emily Fu also transmitted financial data by email to Peachtree Med's accountants for tax preparation purposes and prepared and periodically emailed members an investor distribution worksheet showing the ownership percentages and profit distribution for each member.

142.   Her most recent email providing distribution information was sent to Kaiyou Lin on or about July 30, 2017, and it showed ownership percentages and profit distribution even for Jacob Fu, who, on information and belief, did not contribute any capital to Peachtree Med.  She indicated in the worksheet that 10% of each foreign member's distribution was being withheld for tax purposes, but on information and belief, such withholdings were not paid to the IRS.

143.   On information and belief, Jacob Fu received profit distributions from Peachtree Med to which he was not entitled.

144.   Between April 13, 2016 and July 17, 2016, Emily Fu communicated repeatedly with Peachtree Med members via group chats on the WeChat app.  She used the electronic chat room to update them with information

regarding their investment, including by providing images of financial reports.

### 9.    Eastside Med Partners LLC

145.   In or around October 30, 2016, Emily Fu, on behalf of Capital Investment, sent an investment prospectus to investors residing in China, including to Kaiyou Lin by WeChat, describing the Eastside Digital Imaging building ("Eastside Building"), located at 3445 Highway 81 South, Loganville, GA. The prospectus bore Capital Investment's logo on each page and provided information regarding the property, including area information, existing tenants, a proposed purchase price of $5,650,000, and an expected rate of return of about 7.82% per year.  The purpose of the prospectus was to convince the investors to contribute capital to purchase the Eastside Building.

146.   Emily Fu took potential investors and/or their representatives, Chang Yu and Jieyong Cao, on a tour of the Eastside Building and represented to them it was a good investment.  She promised to handle all aspects of the transaction, including acting as broker; recommending lenders, legal and other advisors; coordinating third party services, including environment and

property appraisals; and serving as manager of the LLC that would hold the Eastside Building.

147.   In or around November 2016, ten investors, Kaiyou Lin, Chang Yu, Fangfang Guo, Deyin Li, Yajun Sun, Lina Xiao, Yu Shi, Xiaohua Yao, Yi Wang, and Capital Investment established Plaintiff Eastside Med Partners LLC ("Eastside Med").  The sole purpose of Eastside Med was to purchase and hold the Eastside Building.

148.   Emily Fu told the Eastside Med members that an attorney drafted the operating agreement, and she was named Manager of the company.  As Manager, she gave herself broad powers, including "full, absolute and complete authority, power and discretion to manage and control the business and affairs of the [Eastside Med]."  Under the agreement, absent dismissal for narrowly defined "cause" or other extraordinary circumstances, Emily Fu could be removed as Manager only by unanimous consent of the members, which could never happen because she or one of her associates is a member of the company.

149.   The Eastside Med members are Chinese nationals whose first language is not English, and they believed the attorney who supposedly drafted the

agreement was acting in their interests.  They also justifiably trusted Emily

Fu and did not understand that the terms of the operating agreement

disproportionately favored the Manager and gave her sole authority to act on

behalf of the company.

150.  As set forth in the Eastside Med operating agreement, each investor's

contribution of initial capital was as follows:

| Investor | Initial Capital |
|---|---|
| K. Lin | $636,000 |
| C. Yu | $636,000 |
| F. Guo | $318,300 |
| D. Li | $318,300 |
| Y. Sun | $318,300 |
| L. Xiao | $318,300 |
| Y. Shi | $222,810 |
| X. Yao | $222,810 |
| Y. Wang | $95,490 |
| Capital Investments | $95,490 |
| Total Initial Contribution | $3,181,800 |

151.  Emily Fu used a Capital Investment bank account to receive the Eastside

Med members' payment of earnest money for the purchase of the Eastside

Building.

152.  Emily Fu opened a bank account in the name of Eastside Med at Metro City

Bank and, on or about November 16, 2016, provided wiring information by

WeChat to Kaiyou Lin to be distributed to the other members, instructing them to wire money from China into the Eastside Med bank account. The funds were intended to represent each investor's initial capital contribution to Eastside Med and were for the sole purpose of purchasing the Eastside Building.

153.  In or about November 2016, in accordance with Emily Fu's instructions, the Eastside Med members caused funds in payment of their initial capital contribution to be deposited into the Eastside Med bank account.

154.  On information and belief, Capital Investment, Emily Fu's company and accomplice, did not wire money into the Eastside Med bank account or otherwise contribute initial capital to Eastside Med. Emily Fu withheld that information from the non-related members.

155.  On or around January 19, 2017, Emily Fu sent Kaiyou Lin what purported to be a closing statement for the purchase of the Eastside Building to be distributed to the Eastside Med members. The statement reflected that Eastside Med would purchase the Eastside Building for a total of $5,650,000, paid via cash and a loan from Touchmark in the amount of

$2,825,000.  The statement purportedly bore the signature of the seller and Emily Fu as Manager of Eastside Med.

156.    As Manager with expansive powers, Emily Fu had sole and full control of Eastside Med.  Emily Fu reported that she and Capital Investment assisted with the management of the Eastside Building, including overseeing the collection of rent and payment of operating expenses.

157.    Between November 9, 2016 and December 14, 2016, Emily Fu communicated repeatedly with Eastside members via group chats on the WeChat app.  She used the electronic chat room to update them with information regarding their investment, including by providing images of financial reports.

### C.    MISAPPROPRIATION OF ASSETS

158.    Based on certain incidents that had occurred within the preceding months, the Lins became suspicious of Emily Fu.  As investors in the various entities, themselves, and Kaiyou Lin being the liaison for the individual investors in China, the Lins decided to reassign the management responsibilities related to the real estate investments.

159.  In November 2017, they met with Emily Fu to begin that process.  Wanjiong

Lin and an associate, Jieyong Cao, attended the meeting.

### 1.    Personal Use of Company Funds

160.  During that meeting,  Emily Fu admitted that she had misappropriated cash

in the sum of  approximately $930,000 without authorization and for

personal use from bank accounts related to the various entities as follows:

| Affected Company | Amount Taken |
|------------------|--------------|
| Intelligent | $152,736.17 |
| Windward Market | $200,000.00 |
| Johns Creek | $38,000.00 |
| Palisades | $80,000.00 |
| Peachtree Med | $45,000.00 |
| Cooper Village | $51,850.00 |
| Eastside Med | $163,000.00 |
| Brannon Crossing | $200,000.00 |
| **TOTAL** | **$930,586.17** |

161.  Until November 2017, Plaintiffs had no knowledge of any of these facts and

relied on Emily Fu's numerous representations and the various statements

she emailed to them regarding the financial status of their properties.

162.   Because Emily Fu was the Manager of seven of the entities and a fiduciary required to act in Plaintiffs' best interest, Plaintiffs were justified in relying on Emily Fu's representations regarding the status of their affairs.

163.   Emily Fu apologized for her wrongdoing and promised to return the funds. She further provided assurances that she would continue managing the properties until her duties were transferred to someone of Wanjiong Lin's choice.

164.   Emily Fu agreed to meet Hongjuan Liu and Kaiyou Lin on Monday, November 20, 2017, to travel together to all banks where Plaintiffs' accounts were being held to obtain and review the respective account information. On the morning of November 20, 2017, Emily Fu contacted Kaiyou Lin via WeChat to inform him that she was on her way to pick him up for the meeting.  But Emily Fu never arrived and has since ceased all communications with the Lins.

165.   After Emily Fu failed to appear for the meeting, Hongjuan Liu called Emily Fu's assistant, Gina Thomas ("Thomas"), who told Ms. Liu she had no knowledge of Emily Fu's whereabouts.

166.   Thomas also told the Lins that she was concerned about a past due notice
that recently arrived from Touchmark addressed to Brannon Crossing.  The
notice indicated that a loan payment of $34,533 was past due on the Shoppes
at Brannon.  This notice both surprised and alarmed the Lins, as Brannon
Crossing had been purchased in an all cash transaction and should have been
free and clear of any encumbrances.  Ninglanta had no knowledge of a loan
on the Shoppes at Brannon, and the financial statements Emily Fu had
provided to Ninglanta bore no evidence of a loan.

167.   Given this discovery, the Lins undertook to research the status of their
various properties.  The Lins have to rely on public records, however,
because Emily Fu, as Manager for seven of the properties, had complete
control over the financial and other records relating to the properties.

### 2.   Unauthorized Loans

168.   The Lins discovered that Emily Fu had executed loans against at least two of
the properties owned by the entities without the authorization or knowledge
of the members or managers of the respective entities.

169.   Specifically, the Lins learned that Emily Fu had taken out the following
unauthorized loans: (i) a loan in the principal amount of $6,000,000 in the

name of Brannon Crossing, for which the Shoppes at Brannon was provided as security; and (ii) a loan in the principal amount of $2,665,000, for which Spalding Plaza was provided as security.

170.   These unauthorized loans were made by Defendant Touchmark.  Emily Fu and Capital Investment had a longstanding relationship with Touchmark that predates the two unauthorized loans.  Indeed, Emily Fu and Capital Investment described Touchmark as their "Strategic Partner" in a presentation provided to prospective investors.

171.   Stacy Cooke was a Vice President/Commercial Relationship Manager of Touchmark until his sudden death in 2017.  He is the Touchmark representative who facilitated the unauthorized loans.  Mr. Cooke had a longstanding relationship with Emily Fu, and, on information and belief, relied on that relationship in approving the unauthorized loans.  Indeed, in or around August 2017, after Stacy Cooke passed away, Emily Fu told Kaiyou Lin that she was having difficulty obtaining loans from Touchmark.

### a.   The Shoppes at Brannon

172.   On and about October 10, 2014, Brannon Crossing purchased the Shoppes at Brannon for $15,000,000 in cash.  The closing documents were signed by

– 55 –

Brannon Crossing's Manager, Yi Wang.  Brannon Crossing received a deed for the property, which was recorded in Forsyth County.  Since the purchase was an all-cash transaction, Brannon Crossing obtained fee simple title to the property, free and clear of any encumbrances.

173.   In November 2017, after learning of Emily Fu's unauthorized use of funds belonging to Plaintiffs and other improper actions, the Lins undertook a search of Forsyth county records and found that an unauthorized security deed in the amount of $6,000,000 had been recorded against the Shoppes at Brannon on December 5, 2014.  The security deed was signed by Emily Fu, purportedly as "President" of Brannon Crossing.

174.   However, Ninglanta is the company's sole member, and Yi Wang has always been its sole Manager with the exclusive power to appoint and delegate authority to officers.  Yi Wang never appointed Emily Fu as President nor did he otherwise grant her authority to execute a loan against the Shoppes at Brannon.

175.   Emily Fu knew she was not authorized to execute a loan against the Shoppes at Brannon and knew she was not the "President" of the company when she executed the loan documents.

176.  It appears Emily Fu made certain false representations to Touchmark in order to improperly obtain an unauthorized loan in the name of Brannon Crossing for her personal use.

177.  Nonetheless, Touchmark did not conduct a proper investigation of the fraudulent documents Emily Fu created and provided in connection with the loan, nor did it conduct sufficient due diligence to determine whether Emily Fu was indeed authorized by Brannon Crossing to take out this loan.

178.  Touchmark also ignored information in the fraudulent documents provided by Emily Fu that would cause a reasonable person to question their authenticity and to conduct additional investigation as to the veracity of the information being presented.

179.  Loan documents obtained from Touchmark in January 2018 show that the bank did not follow its own written procedures for ensuring that persons purporting to act on behalf of a company were indeed authorized to do so.

180.  For example, all of the required fields in Touchmark's own Limited Liability Company Authorization Resolution form were not completed as required. The form, which requires proof that officers of a company were authorized to, for example, borrow money on behalf of the company, required an

attestation by one other Manager or Designated Member.  However, Touchmark permitted Emily Fu to sign this document by herself without the required accompanying attestation of a Manager or Designated Member.

181. In addition, a notice from the Internal Revenue Service to Brannon Crossing, which appears to have been submitted in connection with the loan application, was addressed to "Ninglanta Industry Inc[.] Sole Member, 4500 Peachtree Lake Dr., Duluth, GA  30096," whereas the notice address for the promissory note Emily Fu signed and delivered to Touchmark in connection with the unauthorized loan was stated as "1300 Peachtree Industrial Boulevard, Suite 3209, Suwanee, Georgia, 30024," which is Capital Investment's office.  Touchmark was therefore put on notice of patent discrepancies in the paperwork.

182. As a result, Brannon Crossing did not receive any notices from Touchmark relating to the loan and was not made aware that a loan had been taken out against the Shoppes at Brannon.

183. Touchmark and its employee and agent Stacy Cooke put Emily Fu in the position to convert Brannon Crossing's property without its knowledge and facilitated her fraudulent actions.

184.   Brannon Crossing did not receive the proceeds of the loan.  A review of documents obtained from Touchmark shows that Emily Fu requested and Stacy Cooke directed approximately $5.3 million of the $6 million loan to be transferred to an account in the name of "Sugarloaf Center Retail, Inc., 1300 Peachtree Industrial Blvd., Suite 3209, Suwanee, GA 30024."  Brannon Crossing has no relationship with Sugarloaf Center Retail, Inc., and the address provided is the same as the address of Capital Investment's office. Defendant Nina Xu is the CEO of Sugarloaf Center Retail, Inc.

185.   None of the periodic financial statements Emily Fu provided to Ninglanta or its accountants referenced any outstanding loan or loan payments.

186.   Ninglanta was therefore prevented from learning about the existence of the unauthorized loan, and it justifiably relied on Emily Fu to provide a truthful account of the financial status of the property and certainly to refrain from taking out secret, unauthorized loans in Brannon Crossing's name since she assisted with the management of the property.

187.   On information and belief, Emily Fu personally made monthly payments on the loan to Touchmark and otherwise kept the loan current to avoid legal

proceedings in connection with the loan and to prevent Brannon Crossing from learning of the existence of the loan.

188.   In a letter dated January 19, 2018, Touchmark, through its counsel, informed Brannon Crossing that payments had not been made on the loan since November 2017.  Touchmark stated that such failure was a breach of the security deed and promissory note issued with the loan and gave Brannon Crossing five (5) calendar days to cure the breach.

### b.   Spalding Plaza

189.   On and about June 30, 2016, GII Spalding purchased Spalding Plaza for $5,150,000 in cash.  GII Spalding received a deed for the property, which was recorded in Gwinnett County.  Since the purchase was an all-cash transaction, GII Spalding obtained fee simple title to the property, free and clear of any encumbrances.

190.   In November 2017, after learning of Emily Fu's unauthorized use of funds belonging to Plaintiffs and other improper actions, the Lins undertook a search of Gwinnett county records and found that a security deed in the amount of $2,665,000 had been recorded against Spalding Plaza on August

1, 2016.  The security deed was signed by Emily Fu as "Executive Vice President" of Spalding Plaza.

191. However, as Executive Vice President of Spalding Plaza, Emily Fu was not authorized to enter into any loan agreement on behalf of the company without the prior written consent of Yi Wang, sole Manager of GII Spalding.

192. Emily Fu knew she was not authorized to execute a loan against Spalding Plaza when she executed the loan documents.

193. It appears Emily Fu made certain false representations to Touchmark in order to improperly obtain an unauthorized loan in the name of GII Spalding for her personal use.

194. Nonetheless, Touchmark did not conduct a proper investigation of the fraudulent documents Emily Fu created and provided in connection with the loan, nor did it conduct sufficient due diligence to determine whether Emily Fu was indeed authorized by GII Spalding to take out this loan.

195. Touchmark also ignored information in the fraudulent documents provided by Emily Fu that would cause a reasonable person to question their

authenticity and conduct additional investigation as to the veracity of the

information being presented.

196.   Loan documents obtained from Touchmark in January 2018 show that the

bank did not follow its own written procedures for ensuring that persons

purporting to act on behalf of a company were indeed authorized to do so.

197.   For example, all of the required fields in Touchmark's own Limited Liability

Company Authorization Resolution form were not completed as required.

The form, which requires proof that officers of a company were authorized

to, for example, borrow money on behalf of the company, required an

attestation by one other Manager or Designated Member.  However,

Touchmark simply accepted this form as "acknowledged and received" on

or about July 13, 2016 without *any* signature, much less the required

accompanying attestation of a Manager or Designated Member.

198.   Also, an Internal Revenue Service notice to GII Spalding, which appears to

have been submitted in connection with the loan application, was addressed

to "Yi Wang Sole Mbr, 3264 Saturn Court, Norcross, GA  30092," whereas

the notice address for the promissory note Emily Fu issued to Touchmark in

connection with the unauthorized loan was identified as "c/o Emily Fu, 1300

Peachtree Industrial Boulevard, Suite 3209, Suwanee, Georgia, 30024," which is Capital Investment's office.  Touchmark was therefore put on notice of patent discrepancies in the documents.

199.  As a result, GII Spalding did not receive any notices relating to the loan and was not aware that a loan had been made against Spalding Plaza.

200.  Touchmark and its employee and agent Stacy Cooke put Emily Fu in the position to convert GII Spalding's property without its knowledge and facilitated her fraudulent actions.

201.  GII Spalding did not receive the proceeds of the loan.

202.  None of the periodic financial statements Emily Fu provided to Goldenfield or its accountants referenced any outstanding loan or loan payments.

203.  Goldenfield was therefore prevented from learning about the existence of the unauthorized loan, and it justifiably relied on Emily Fu to provide a truthful account of the financial status of the property and certainly to refrain from taking out secret, unauthorized loans in GII Spalding's name since she assisted with the management of the property.

204.   On information and belief, Emily Fu personally made monthly payments on the loan to Touchmark and otherwise kept the loan current to avoid legal proceedings in connection with the loan and to prevent Brannon Crossing from learning of its existence.

205.   In a letter dated January 19, 2018, Touchmark, through its counsel, informed GII Spalding that payments had not been made on the loan since November 2017.  Touchmark stated that such failure was a breach of the security deed and promissory note issued with the loan and gave GII Spalding five (5) calendar days to cure the breach.

### 3.   Ghost Properties

206.   The Lins also discovered that at least three of the companies they had formed and funded (in conjunction with other investors) to purchase specific properties did not own those properties.

### a.   Sugarloaf Center

207.   Even though Emily Fu and Capital Investment provided a settlement statement to Johns Creek investors showing that Johns Creek had purchased the Sugarloaf Center, and they circulated other documents, including financial statements and investor distribution worksheets, similarly showing

that Johns Creek owned that property, Gwinnett County records show no

transfer of ownership of the Sugarloaf Center to Johns Creek.

208.   The Sugarloaf Center continues to be owned by an unrelated entity—

Sugarloaf Center LLC.

209.   Emily Fu knew at the time she sent the settlement statement, financial

statements, and investor distribution worksheets that they were false.  She

sent the falsified documents to induce the non-related Johns Creek members

to send funds to her and Capital Investment and to cover up the illegal

conversion of their funds.

210.   It is unclear what happened to the more than $1.5 million that the Lin

investors who became Johns Creek members deposited in the Capital

Investment and Johns Creek bank accounts at Emily Fu's direction.  On

information and belief, Emily Fu had no intention to execute the Sugarloaf

Center purchase transaction and instead intended to convert the funds to her

personal use.

211.   Georgia Secretary of State records indicate that, on August 24, 2017, Johns

Creek was administratively dissolved for failing to file its annual

registration.  Johns Creek's reinstatement was secured on December 15, 2017.

212.  The Johns Creek investors relied on Emily Fu's numerous representations regarding the status of the property and the various documents she emailed to them, including a closing statement.  Because Emily Fu was Manager of Johns Creek and legally and contractually required to act in the company's best interest, the Johns Creek investors were justified in relying on Emily Fu's representations regarding the Sugarloaf Center.

### b.    North Atlanta Primary Care

213.  Even though Emily Fu and Capital Investment provided a settlement statement to Palisades investors showing that Palisades would purchase North Atlanta Primary Care and had sent other documents, including financial statements and investor distribution worksheets, similarly showing that Palisades owned that property, Fulton County records show no transfer of ownership of North Atlanta Primary Care to Palisades.

214.  North Atlanta Primary Care was sold to REDUS Georgia Commercial, LLC—an unrelated entity—on April 20, 2016.

215.  Emily Fu knew at the time she sent the settlement statement, financial

statements, and investor distribution worksheets that they were false.  She

sent the falsified documents to induce the non-related Palisades members to

send funds to her and Capital Investment and to cover up the illegal

conversion of their funds.

216.  It is unclear what happened to the more than $1.3 million that the Lin

investors who became Palisades members deposited in the Capital

Investment and Palisades bank accounts at Emily Fu's direction.  On

information and belief, Emily Fu had no intention to execute the North

Atlanta Primary Care purchase transaction and instead intended to convert

the funds to her personal use.

217.  The Palisades investors relied on Emily Fu's numerous representations

regarding the status of the property and the various documents she emailed

to them, including a closing statement.  Because Emily Fu was Manager of

Palisades and legally and contractually required to act in the company's best

interest, the Palisades investors were justified in relying on Emily Fu's

representations regarding North Atlanta Primary Care.

### c. Eastside Building

218. Even though Emily Fu and Capital Investment provided a settlement statement to Eastside Med investors showing that Eastside Med had purchased the Eastside Building, and they sent other documents, including financial statements and investor distribution worksheets, similarly showing that Eastside Med owned that property, Walton County records show no transfer of ownership of the Eastside Building to Eastside Med.

219. The Eastside Building was instead sold to Eastside Medical Center, LLC— an unrelated entity—on July 31, 2017.

220. Emily Fu knew at the time she sent the settlement statement, financial statements, and investor distribution worksheets that they were false. She sent the falsified documents to induce the non-related Eastside Med members to send funds to her and Capital Investment and to cover up the illegal conversion of their funds.

221. It is unclear what happened to the more than $3 million that the Lin investors who became Eastside Med members deposited in the Capital Investment and Eastside Med bank accounts at Emily Fu's direction. On information and belief, Emily Fu had no intention to execute the Eastside

Building purchase transaction and instead intended to convert the funds to her personal use.

222. Georgia Secretary of State records indicate that, on August 24, 2017, Eastside Med was administratively dissolved for failing to file its annual registration.  Eastside Med's reinstatement was secured on December 15, 2017.

223. The Eastside Med investors relied on Emily Fu's numerous representations regarding the status of the property and the various documents she emailed to them, including a closing statement.  Because Emily Fu was Manager of Eastside Med and legally and contractually required to act in the company's best interest, the Eastside Med investors were justified in relying on Emily Fu's representations regarding the Eastside Building.

### 4.    Purchase Price Discrepancies

224. The Lins also discovered that the purchase price of at least three properties had been artificially inflated by Emily Fu and Capital Investment.

### a.    Market Forest Shops

225. The purchase agreement and the transaction settlement statement Emily Fu provided to Windward Market members indicated that the Market Forest

Shops purchase price was $3,900,000.  However, Fulton County records show that the purchase price was actually $3,500,000.

226. It is unclear what happened to the $400,000 in excess of the purchase price Windward Market members provided to Emily Fu and Capital Investment to purchase the property.

227. On information and belief, Emily Fu falsified the purchase agreement and the settlement statement intentionally to inflate the purchase price by $400,000 and convert those excess funds to her personal use.

### b.    Cooper Retail Center

228. The purchase agreement and the transaction settlement statement Emily Fu provided to Cooper Village members indicated that the Cooper Retail Center purchase price was $5,800,000.  However, Gwinnett County records show that the purchase price was actually $5,500,000.

229. It is unclear what happened to the $300,000 in excess of the purchase price Cooper Village members provided to Emily Fu and Capital Investment to purchase the property.

230.  On information and belief, Emily Fu falsified the purchase agreement and the settlement statement intentionally to inflate the purchase price by $300,000 and convert those excess funds to her personal use.

### c.      Peachtree Corners

231.  The purchase agreement and the transaction settlement statement Emily Fu provided to Peachtree Med members indicated that the Peachtree Corners purchase price was $1,850,000.  However, Gwinnett County records show that the purchase price was actually $1,400,000.

232.  It is unclear what happened to the $450,000 in excess of the purchase price Peachtree Med members provided to Emily Fu and Capital Investment to purchase the property.

233.  On information and belief, Emily Fu falsified the purchase agreement and the settlement statement intentionally to inflate the purchase price by $450,000 and convert those excess funds to her personal use.

### 5.      Other Improper Use of Company Funds

234.  The Lins also discovered unauthorized wire transfers sending funds investors provided for the purchase of certain properties to what appears to be Nina Xu's personal account at Chase Bank, including: (1) a transfer of

$500,000 on March 18, 2016; (2) a transfer of $100,000 on April 14, 2016; and (3) a transfer of $750,000 on May 11, 2016.

### D.    DAMAGES

235.    Upon discovery of Emily Fu's unauthorized and fraudulent actions, the Lins contacted the Federal Bureau of Investigation ("FBI") and the United States Department of Justice ("DOJ") to make a complaint.  Both the FBI and DOJ have assigned staff to this matter and have opened an investigation.

236.    On January 9, 2018, the DOJ, through the United States Postal Inspection Service, sent letters to Plaintiffs informing them that they had been identified as possible victims of alleged mail fraud.  The letters provided a case number and instructions for accessing the federal government's Victim Notification System for updates regarding the matter.  The letters further provided information regarding the Victim Witness Assistance Program.

237.    The Lins were initially unable to locate Emily Fu, and at one point, Joshua Fu told Plaintiffs that Emily Fu may be in Ecuador.  An attorney subsequently contacted Plaintiffs' counsel to inform them that Emily Fu had retained him to represent her in the criminal investigation.  It appeared that Emily Fu was still in Georgia.  The attorney, however, subsequently

informed Plaintiffs' counsel that he no longer represented Emily Fu.  The Fu

sons, who were also officers of Capital Investment and/or were involved in

the management of the entities, have likewise refused to cooperate with

Plaintiffs.

### 1.    Business Interruption

238.  Because Emily Fu is Manager with sole and full control of seven of the

affected entities, Plaintiffs have been unable to operate their businesses

effectively.  Many of the entities cannot access some or all of their bank

accounts because Emily Fu is the only person authorized to access the

accounts.  Additionally, absent authorization from Emily Fu or another duly

appointed Manager, Metro City Bank, a financial institution at which

Plaintiffs believe accounts are being held in the their names, has refused to

provide information regarding any such accounts.  Thus, certain Plaintiffs do

not know where their accounts are being held and what balances may remain

in those accounts, if any.

239.  On information and belief, Emily Fu has drained and closed certain accounts

and converted the proceeds of those accounts to her personal use.

240.   Further, certain Plaintiffs have been unable to negotiate year end lease renewals, enter into agreement for property management services, and take other actions necessary to operate a commercial real estate business because, as Manager with sole authority over those entities, Emily Fu is the only person currently authorized to take such actions.

241.   Plaintiffs tried to obtain Emily Fu's and the Fu-related members' (Jacob Fu, Joshua Fu, Larina Hsiu-Lan Lin,[3] and Capital Investment) consent to remove Emily Fu as Manager of the entities and to appoint a replacement manager in her place, but after initially indicating that Emily Fu would cooperate with Plaintiffs, Emily Fu's counsel informed Plaintiffs' counsel on December 13, 2017 that he no longer represented her.  Thus, the only line of communication with Emily Fu is closed.

242.   Plaintiffs have obtained written consents to remove Emily Fu as Manager and appoint a new Manager from all members of each entity, except for the Fu-related members.  However, under the respective operating agreements of Johns Creek, Windward Market, Palisades, Peachtree Med, and Eastside

_____

[3] Larina Hsiu-Lan Lin is not related to the Lins, and, on information and belief, is related to Emily Fu's husband.

Med, those consents may not be sufficient to remove Emily Fu because absent dismissal for narrowly defined "cause" or other extraordinary circumstances, unanimous consent, including from the Fu-related members, is required.

### 2.    Money and Other Damages

243.  As described above, the Fu Defendants have, either independently or by agreement to act in concert, and/or with knowledge of Emily Fu's actions, misappropriated millions of dollars from Plaintiffs, including but not limited to the following: by converting funds provided for the purchase of commercial real estate to their personal use; inflating the purchase price of the properties and pocketing the difference; embezzling and spending money from the entities' bank accounts for personal use; obtaining unauthorized loans in certain entities names and converting the proceeds of those loans to personal use; taking ownership interests in and/or profit distributions from entities to which they did not contribute initial capital; facilitating and being complicit in Emily Fu's misrepresentations and other unlawful actions; and otherwise using the resources of the entities for unauthorized, personal use.

244. Touchmark and Stacy Cooke's negligence allowed Emily Fu to convert Brannon Crossing's and GII Spalding's property without their knowledge and otherwise facilitated her fraudulent actions.  Touchmark also recorded security deeds against Brannon Crossing's and GII Spalding's property for loans that were unauthorized by those entities.

245. As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered damages, including but not limited to the loss of millions of dollars in cash.

246. The Fu Defendants engaged in willful, malicious, and intentional conduct, all with the specific purpose of injuring Plaintiffs and have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

### III.   CAUSES OF ACTION

### COUNT I:  FEDERAL RICO (18 U.S.C. § 1962(c))
(against Defendants Emily Fu, Jacob Fu, Joshua Fu,
Nina Xu, and Capital Investment (the "Fu Defendants"))

247. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 246 above as if fully stated herein.

248. Capital Investment is an enterprise engaged in, and whose activities affect, foreign commerce. Emily Fu, Jacob Fu, Joshua Fu, and Nina Xu (the "Individual Defendants") are or were currently employed by or associated with Capital Investment at the time of the wrongdoing alleged herein.

249. The Individual Defendants agreed to and did conduct and participate in the conduct of Capital Investment's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs, including by obtaining funds from Plaintiffs by fraudulent means and transmitting fraudulent documents to Plaintiffs by wire; causing to be transferred from China and Hong Kong money converted or taken by fraud from Plaintiffs; receiving unlawfully converted money across the United States border; and obtaining Plaintiffs' funds at Touchmark and other banks by means of fraudulent representations.

250. Pursuant to and in furtherance of their fraudulent scheme, the Fu Defendants committed multiple related acts of (i) obtaining money by means of fraudulent pretenses and representations and transmitting by wire writings for the purpose of executing the fraud in violation of 18 U.S.C. § 1343; (ii) transferring in foreign commerce money converted or taken by fraud in

violation of 18 U.S.C. § 2314; (iii) receiving money that crossed the United States border after being unlawfully converted or taken in violation of 18 U.S.C. § 2315; and (iv) obtaining Plaintiffs' funds at Touchmark and other banks by means of fraudulent representations in violation of 18 U.S.C. § 1344.

251. The acts set forth above, including wire fraud, transferring money taken by fraud, receiving unlawfully converted money across the United States border, and obtaining Plaintiffs' funds at financial institutions by fraudulent means, constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

252. The Individual Defendants have directly and indirectly conducted and participated in the conduct of Capital Investment's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

253. As a direct and proximate result of the Fu Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as set forth in Section II(D) above.

## <u>COUNT II:  FEDERAL RICO (18 U.S.C. § 1962(d))</u>

(against the Fu Defendants)

254. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 253 above as if fully stated herein.

255. As set forth above, Fu Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), including by obtaining funds from Plaintiffs by fraudulent means and transmitting fraudulent documents to Plaintiffs by wire; causing to be transferred from China and Hong Kong money converted or taken by fraud from Plaintiffs; receiving unlawfully converted money across the United States border; and obtaining Plaintiffs' funds at Touchmark and other banks by means of fraudulent representations.

256. The Fu Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise (Capital Investment) through a pattern of racketeering activity.

257. The Fu Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

258.  As a direct and proximate result of the Fu Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property as set forth in Section II(D) above.

## COUNT III:  CONVERSION
(against the Fu Defendants)

259.  Plaintiffs incorporate the allegations contained in Paragraphs 1 through 258 above as if fully stated herein.

260.  The Fu Defendants were not authorized to withdraw for personal use funds held in Plaintiffs' bank accounts or otherwise take Plaintiffs' funds, ownership interests, or distributions to which they were not entitled.  They improperly and fraudulently assumed and exercised the right of ownership over such funds, and their actions were contrary to Plaintiffs' rights.

261.  Emily Fu, Nina Xu, and Capital Investment (the "Capital Investment Defendants") were not authorized to encumber the Shoppes at Brannon Crossing and Spalding Plaza properties with loans.  They improperly and fraudulently assumed and exercised the right of ownership over such

properties, and their actions were contrary to the rights of Brannon Crossing and Spalding Plaza.

262. The Capital Investment Defendants were not authorized to retain for personal use Plaintiffs Johns Creek, Palisades, and Eastside Med's funds in specific accounts that were designated for the purchase of specified commercial real estate. They improperly and fraudulently assumed and exercised the right of ownership over such specific funds and accounts, and their actions were contrary to the rights of Johns Creek, Palisades, and Eastside Med.

263. The Capital Investment Defendants were not authorized to retain for personal use the excess funds they caused Plaintiffs Cooper Village, Peachtree Med, and Windward Market to secure for the purchase of specified commercial real estate. They improperly and fraudulently assumed and exercised the right of ownership over such funds, and their actions were contrary to the rights of Cooper Village, Peachtree Med, and Windward Market.

264. Plaintiffs have demanded that the Fu Defendants return the converted property, and they have not complied.

265.  Plaintiffs have suffered and will continue to suffer damages as a proximate

cause of the wrongful actions of the Fu Defendants.

## COUNT IV:  FRAUDULENT MISREPRESENTATION
(against the Capital Investment Defendants)

266.  Plaintiffs incorporate the allegations contained in Paragraphs 1 through 265

above as if fully set forth herein.

267.  The Capital Investment Defendants provided false settlement statements and

other documents and information to Plaintiffs.

268.  The Capital Investment Defendants knew such settlement statements and

other documents and information provided to Plaintiffs were false.

269.  The Capital Investment Defendants made the false representations to induce

Plaintiffs to provide funds for the purchase of specified commercial real

estate or to cover up their illegal conversion of Plaintiffs' properties and/or

funds.

270.  Plaintiffs justifiably relied on the Capital Investment Defendants'

representations.

271. Plaintiffs have suffered and will continue to suffer damages as a proximate cause of the actions of the Capital Investment Defendants.

## COUNT V:  BREACH OF FIDUCIARY DUTY
(against Emily Fu)

272. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 271 above as if fully stated herein.

273. As Executive Vice President of GII Spalding, Emily Fu owed a fiduciary duty to the company.

274. Emily Fu breached that duty by, among other things, her unauthorized encumbrance of Spalding Plaza with a loan underwritten by Touchmark.

275. Spalding Plaza has suffered and will continue to suffer damages as a proximate cause of Emily Fu's breach of her fiduciary duty.

276. As Manager of Intelligent, Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, and Eastside Med, Emily Fu owed a fiduciary duty to those companies.

277.   Emily Fu breached that duty by, among other things, converting the funds of

those entities to her personal use and failing to purchase real estate as

required in certain cases.

278.   The affected entities have suffered and will continue to suffer damages as a

proximate cause of Emily Fu's breach of her fiduciary duty.

## COUNT VI:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(against Jacob Fu, Joshua Fu, Nina Xu, and
Capital Investment (the "Count VI Defendants"))

279.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 278

above as if fully stated herein.

280.   The Count VI Defendants knew that Emily Fu was the Manager of Plaintiffs

Intelligent, Johns Creek, Windward Market, Palisades, Cooper Village,

Peachtree Med, and Eastside Med and was the Executive Vice President of

GII Spalding (the Count VI Plaintiffs) and therefore owed a duty to act in

the best interests of those entities.

281.   The wrongful actions of the Count VI Defendants, including facilitating

Emily Fu's false representations or otherwise assisting or being complicit in

Emily Fu's fraudulent actions, served to procure Emily Fu's breach of her

fiduciary duty to the Count VI Plaintiffs.

282.   The Count VI Defendants acted purposely and with malice and the specific

intent to injure the Count VI Plaintiffs.

283.   The Count VI Plaintiffs have suffered and will continue to suffer damages as

a proximate cause of the actions of the Count VI Defendants.

### COUNT VII:  MONEY HAD AND RECEIVED
(against the Capital Investment Defendants)

284.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 283

above as if fully set forth herein.

285.   The Capital Investment Defendants have placed themselves in the position

of receiving and retaining money from Plaintiffs and did receive and retain

money from Plaintiffs to which they were not lawfully entitled.  They have

taken those sums of money from Plaintiffs improperly.

286.   Plaintiffs have demanded that the Capital Investment Defendants return such

sums, and Defendants have not complied.

287.  The Capital Investment Defendants should not be permitted to keep such sums of money in equity and good conscience.

288.  Plaintiffs have suffered and will continue to suffer damages as a proximate cause of the Capital Investment Defendants' actions.

289.  The Capital Investment Defendants must return those funds to Plaintiffs.

## COUNT VIII: GEORGIA RICO (O.C.G.A. § 16-14-4)
(against the Fu Defendants)

290.  Plaintiffs incorporate the allegations contained in Paragraphs 1 through 289 above as if fully set forth herein.

291.  As set forth above, the Fu Defendants violated O.C.G.A. § 16-8-4 (theft by conversion) and O.C.G.A. § 16-8-3 (theft by deception/fraudulent misrepresentation).

292.  The Fu Defendants violated O.C.G.A. § 16-8-4  and O.C.G.A. § 16-8-3 in furtherance of a scheme to convert Plaintiffs' funds and equity ownership to their personal use.

293.  The Fu Defendants' unlawful actions constitute a pattern of racketeering activity under O.C.G.A. § 16-14-4.

294. The Fu Defendants derived financial rewards from their racketeering activity and scheme in the form of cash proceeds or other benefits in violation of O.C.G.A. § 16-14-4.

295. Plaintiffs have suffered and will continue to suffer damages as a proximate cause of the Fu Defendants' actions.

296. Pursuant to O.C.G.A. § 16-14-6, the Fu Defendants are liable to Plaintiffs for three times the actual damages they caused and also for Plaintiffs' attorneys' fees and costs of investigation and litigation.

297. The Fu Defendants are also liable for punitive damages because they acted willfully, maliciously and intentionally.

## COUNT IX: DECLARATORY JUDGMENT
(against Emily Fu)

298. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 297 above as if fully set forth herein.

299. A justiciable controversy exists as to whether Plaintiffs may remove Emily Fu from her role as Manager "for cause" or otherwise.

300. Plaintiffs seek a declaration that Emily Fu's conduct, including converting Plaintiffs' funds provided for the purchase of commercial real estate to her personal use; embezzling and spending money from the entities' bank accounts for personal use; and obtaining unauthorized loans in certain entities names and converting the proceeds of those loans to personal use, constitutes "cause" authorizing her dismissal.

301. In particular, Plaintiffs seek and are entitled to a declaration that (i) Emily Fu's actions constitute fraud and misappropriation of funds committed in her capacity as Manager and that such actions have had a material adverse effect on each of the Plaintiffs for which she serves as Manager; and (ii) Emily Fu's conduct as described herein constitutes a repeated and continuing failure to perform or comply with material obligations under the operating agreements of the Plaintiffs for which she serves as Manager, which she has not corrected after having more than 30-days' written notice to do so.

## COUNT X:  EQUITABLE REFORMATION AND OTHER EQUITABLE RELIEF
### (against the Fu Defendants)

302. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 301 above as if fully set forth herein.

303.  The Capital Investment Defendants fraudulently induced the installation of Emily Fu as Manager of Intelligent, Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, and Eastside Med with expansive, unchecked powers.

304.  The Fu Defendants have exploited and are continuing to exploit Emily Fu's wrongly acquired powers as Manager in ways that are working and will continue to work irreparable harm on these entities.

305.  Having fraudulently obtained Emily Fu's position as Manager, the Fu Defendants are persisting in their wrongful conduct to retain her in that position with respect to Johns Creek, Windward Market, Palisades, Peachtree Med, and Eastside Med (the "Count X Plaintiffs").

306.  There is no adequate remedy at law for the injuries the Count X Plaintiffs are suffering as the consequence of Emily Fu's continuing position as their Manager despite having been caught misappropriating their funds, among other wrongful acts.

307.  The Count X Plaintiffs seek and are entitled to equitable orders sufficient to do complete justice and provide them complete relief from the ongoing

harms pursuant to O.C.G.A. §§ 23-1-7; 23-1-8, 23-1-12, including removing Emily Fu as their Manager.

308. In addition, or alternatively, the Count X Plaintiffs are entitled to have their operating agreements equitably reformed so that each operating agreement allows removal and replacement of the Manager by members owning a combined majority interest in the company, for which purpose Defendants or the parties who did not contribute initial capital to the respective entities shall not be counted as "Members," and their consent to the reformation shall not be required.

309. In addition, the respective operating agreements should be reformed to allow a majority of the Members who contributed capital to the respective entities to act on certain matters on behalf of those entities, including bringing suit on behalf of the entities.

310. In addition, the operating agreements of Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, and Eastside Med should be reformed to remove any Member that did not contribute initial capital to the respective entities.

311.   In addition, or alternatively, the Court should grant whatever additional

equitable relief is shown by the evidence to be necessary or warranted to

protect any of the Plaintiffs.

## COUNT XI:  NEGLIGENCE
(against Touchmark)

312.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 311

above as if fully stated herein.

313.   Touchmark had a duty to execute its loan application and due diligence

procedures in accordance with its own written policies and procedures, with

a reasonable standard of conduct, and in a manner that would not subject the

assets of Brannon Crossing and GII Spalding to unreasonable and

unnecessary risk.

314.   Alternately, Touchmark was in a position to prevent Emily Fu from taking

unauthorized loans in the names of Brannon Crossing and GII Spalding and

misappropriating the proceeds.  Touchmark owed a duty to protect and

should have protected Brannon Crossing and GII Spalding from such

unauthorized loans.

315.   In failing to undertake reasonable due diligence and in otherwise facilitating Emily Fu's execution of the unauthorized loans, Touchmark breached its duty of care to Brannon Crossing and GII Spalding.

316.   Brannon Crossing and GII Spalding have suffered and will continue to suffer damages as a proximate cause of Touchmark's negligence.

## COUNT XII: CIVIL CONSPIRACY
(against the Fu Defendants)

317.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 316 above as if fully set forth herein.

318.   Two or more Defendants, acting in concert, committed at least one of the above torts in furtherance of a scheme to induce Plaintiffs to provide cash proceeds for personal use and financial and other benefits to Defendants.

319.   Plaintiffs have suffered and will continue to suffer damages as a proximate cause of Defendants' actions.

## COUNT XIII:  QUIET TITLE (O.C.G.A. § 23-3-40)
(against Touchmark)

320.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 319 above as if fully stated herein.

321.  Brannon Crossing purchased the Shoppes at Brannon in cash, free and clear of any encumbrances.

322.  GII Spalding purchased Spalding Plaza in cash, free and clear of any encumbrances.

323.  Touchmark facilitated or otherwise assisted Emily Fu in securing unauthorized loans in the names of Brannon Crossing and GII Spalding and executing security deeds against the Shoppes at Brannon and Spalding Plaza, respectively, as collateral for the loans.

324.  Neither Brannon Crossing nor GII Spalding received the proceeds of the unauthorized loans.

325.  The security deeds Emily Fu fraudulently executed for the unauthorized loans in favor of Touchmark cast a cloud over Brannon Crossing's and GII Spalding's titles to the Shoppes at Brannon and Spalding Plaza, respectively.

326.  These security deeds are subjecting Brannon Crossing and GII Spalding to annoyance, liability, and other injury.

327.   Cancellation of these security deeds is necessary to protect Brannon

Crossing's and GII Spalding's interests in the Shoppes at Brannon and

Spalding Plaza, respectively.

328.   Brannon Crossing and GII Spalding cannot immediately or effectually

maintain or protect their rights by any other course of proceeding and have

no other adequate remedy at law.

329.   Brannon Crossing and GII Spalding have suffered and will continue to suffer

damages as a proximate cause of Touchmark's negligent actions.

330.   Pursuant to O.C.G.A. § 23-3-41, Touchmark is additionally liable for

Brannon Crossing's and GII Spalding's attorneys' fees and costs of

investigation and litigation.

## COUNT XIV:  DECLARATORY JUDGMENT
(against Touchmark)

331.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 330

above as if fully stated herein.

332.   Touchmark facilitated or otherwise assisted Emily Fu in securing

unauthorized loans in the names of Brannon Crossing and GII Spalding and

executing security deeds against the Shoppes at Brannon and Spalding Plaza, respectively, as collateral for the loans.

333.   In failing to undertake reasonable care and diligence in the loan application process, Touchmark breached its duty of care to Brannon Crossing and GII Spalding.

334.   Neither Brannon Crossing nor GII Spalding received the proceeds of the unauthorized loans.

335.   The security deeds Emily Fu executed for the unauthorized loans in favor of Touchmark cast a cloud over Brannon Crossing's and GII Spalding's titles to the Shoppes at Brannon and Spalding Plaza, respectively.

336.   These security deeds are subjecting Brannon Crossing and GII Spalding to annoyance, liability, and other injury.

337.   There is an actual controversy among the parties because Touchmark has issued a notice of default to Brannon Crossing and GII Spalding in connection with these loans, even though neither entity authorized the loan, had notice of the loan, or received the proceeds of the loan.

338. Touchmark's notice of default is a condition precedent in instituting foreclosure proceedings against Brannon Crossing and GII Spalding, and such proceedings are likely imminent.

339. This Court may adjudicate the matters at issue and enter a judgment declaring the rights of all parties to this action under 28 U.S.C. § 2201.

340. Accordingly, Brannon Crossing and GII Spalding request that this Court enter an order:

> (i) finding that the loans Touchmark issued in the names of Brannon Crossing and GII Spalding were unauthorized;
>
> (ii) declaring that Brannon Crossing and GII Spalding are not liable for the unauthorized loans;
>
> (iii) or alternately declaring that, pursuant to O.C.G.A. § 23-1-14, Touchmark facilitated Emily Fu's wrongdoing and otherwise put her in a position to inflict injury upon Brannon Crossing and GII Spalding and should therefore bear any loss related to the unauthorized loans;
>
> (iv) ordering that the security deeds Touchmark recorded in connection with such unauthorized loans are null and void and must be cancelled;
>
> (v) awarding attorneys' fees and costs to Brannon Crossing and GII Spalding in bringing this action against Touchmark; and
>
> (vi) providing such other relief as the Court deems appropriate.

## COUNT XV:  INJUNCTIVE RELIEF
(against all Defendants)

341. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 340 above as if fully set forth herein.

342. Plaintiffs are suffering harm and will continue to suffer irreparable harm as a result of Defendants' conduct.  Temporary, preliminary, and permanent injunctions are therefore necessary to prevent this harm.

343. The balance of the equities and public policy favor granting an injunction.

344. The Count X Plaintiffs therefore seek a temporary restraining order and preliminary injunction allowing them to (i) suspend Defendant Emily Fu as their Manager and from any other capacity related to the entities, and bar her from exercising any of the authority, rights, powers, duties, and obligations attendant on such positions; and (ii) appoint one or more interim Managers by the procedures specified in their respective operating agreements, except that, for purposes of such appointment, the Fu-related members and the members who did not contribute initial capital to the respective entities shall not be counted as "Members" of Plaintiffs, and their consent to the appointment shall not be required.

345. Brannon Crossing and GII Spalding therefore seek a temporary restraining order and a preliminary injunction against Touchmark prohibiting it from instituting foreclosure proceedings or initiating any other type of litigation relating to the Shoppes at Brannon and Spalding Plaza during the pendency of this action.

### COUNT XVI:  PUNITIVE DAMAGES (O.C.G.A. § 51-12-5.1(f))
(against the Fu Defendants)

346. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 345 above as if fully stated herein.

347. Defendants engaged in willful, malicious and intentional conduct, all with the specific purpose of injuring Plaintiffs and are therefore liable to Plaintiffs for punitive damages in accordance with O.C.G.A. § 51-12-5.1(f).

### COUNT XVII:  ATTORNEYS' FEES (O.C.G.A. § 13-6-11)
(against all defendants)

348. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 347 above as if fully stated herein.

349. Defendants acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.  As a result, Plaintiffs are

entitled to an award of their litigation expenses, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

350. Plaintiffs are also entitled to an award of their attorneys' fees pursuant to O.C.G.A. § 16-14-6, O.C.G.A. § 23-3-41, and 18 U.S.C. § 1962(c) for the reasons set forth above.

THEREFORE, Plaintiffs respectfully pray that:

   a. A trial by jury be had on all issues in this case;

   b. Plaintiffs be awarded actual, treble, and punitive damages as allowed by law;

   c. Defendants' purported membership interest in Plaintiffs, if any, be divested as provided under the Federal and Georgia RICO statutes;

   d. Plaintiffs be awarded prejudgment interest as allowed by law;

   e. Plaintiffs' attorneys' fees and costs be taxed against Defendants; and

   f. Plaintiffs be granted such other relief as the Court deems just and appropriate.

Dated:        January 24, 2018

Respectfully submitted,

JONES DAY


/s/ Jennifer Bunting-Graden
E. Kendrick Smith
  (Ga. Bar No. 656725)
  eksmith@jonesday.com
Jamila M. Hall
  (Ga. Bar No. 319053)
  jhall@jonesday.com
Jennifer Bunting-Graden
  (Ga. Bar No. 188520)
  jbuntinggraden@jonesday.com
Natalie Williams
  (Ga. Bar No. 622660)
  nwilliams@jonesday.com

JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, GA  30309-3053
Telephone:  (404) 521-3939
Facsimile:   (404) 581-8330

*Attorneys for Plaintiffs*

## <u>LOCAL RULE 5.1 CERTIFICATION</u>

I hereby certify that the foregoing COMPLAINT FOR DAMAGES AND

EQUITABLE AND INJUNCTIVE RELIEF has been prepared in Times New

Roman 14 point font in accordance with Local Rule 5.1.


 Dated: January 24, 2018                     Respectfully submitted,


                                             JONES DAY


                                             /s/ Jennifer Bunting-Graden
                                             Jennifer Bunting-Graden

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have this day served a true and correct copy of the foregoing upon the following parties via the U.S. District Court CM/ECF electronic filing and notification system as follows:

Paul S. Kish
KISH & LIETZ, P.C.
225 Peachtree St, NE.
1700 South Tower
Atlanta, GA 30303

*Attorney for Emily Fu*

William J. Piercy
BERMAN FINK VAN HORN, P.C.
3475 Piedmont Road, Suite 1100
Atlanta, GA 30305

*Attorney for Jacob Fu and Joshua Fu*

This 24th day of January, 2018.

/s/ Jennifer Bunting-Graden

Jennifer Bunting-Graden