## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

INTELLIGENT INVESTMENT          :
INTERNATIONAL LLC,              :
BRANNON CROSSING                :
PARTNERS LLC, WALKS AT          :
JOHN CREEK PARTNERS LLC,        :
WINDWARD MARKET FOREST          :
LLC, PALISADES WEST PACES       :
PARTNERS LLC, GII               :
SPALDING PLAZA LLC,             :
PEACHTREE MED BUILDING          :   CIVIL ACTION NO.
PARTNERS LLC, and EASTSIDE      :   1:17-CV-05296-RWS
MED PARTNERS LLC,               :
                                :
    Plaintiffs,          :
                                :
    v.                   :
                                :
EMILY FU, CAPITAL               :
INVESTMENT                      :
INTERNATIONAL, INC., JACOB      :
FU, JOSHUA FU, NINA XU, and     :
TOUCHMARK NATIONAL              :
BANK,                           :
                                :
    Defendants.          :

## <u>ORDER</u>

This case comes before the Court on Defendants Jacob Fu and Joshua

Fu's Second Motion to Dismiss [43]; Defendant Touchmark Nation Bank's

Motion to Dismiss in Part [59]; ServisFirst Bank's Motion to Intervene [49];

and ServisFirst Bank's Motion for Relief from Order on Motion for TRO [50].

After reviewing the record, the Court enters the following Order.

## Background[1]

This case concerns Defendant Emily Fu's fraudulent real estate investment scheme. Emily Fu pled guilty to mail fraud for her role in this matter under 18 U.S.C.§ 1341 on July 12, 2018 and is currently in prison. See USA v. Fu, 2:18-cr-00023, Dkt. [18, 32] (N. D. Ga. July 12, 2018). She has a default judgment against her in this action. Her company Capital Investment International, Inc. and alleged associate Nina Xu are also in default.[2]

What remains to be determined is the civil liability of her sons Joshua and Jacob Fu, as well as Touchmark National bank, which provided loans for many of the properties at issue. As such, while the facts regarding Emily Fu's actions may still be in dispute insomuch as they relate to the remaining parties' involvement, the Court will focus on the facts as they pertain to these three parties.

_____

[1] Unless otherwise noted, the background facts are taken from Plaintiffs' Second Amended Complaint [40] and are accepted as true.

[2] Plaintiffs are instructed to timely move for entry of default as to these Defendants.

2

## I.      Factual Background

Between 2014 and 2017, Defendant Emily Fu, the sole owner of

Defendant Capital Investment International, Inc. ("Capital Investment"),

assisted groups of Chinese investors with purchasing and managing

commercial real estate properties in the metro-Atlanta area.  Each of the nine

named Plaintiffs in this action is an entity created, with Emily Fu's assistance,

for the purpose of purchasing a specific commercial property.  For clarity, the

Court provides the below chart:

| LLC Name | Property Purchased | Members |
| --- | --- | --- |
| Intelligent Investment International LLC ("Intelligent") | Shoppes at Mall of Georgia ("Mall of Georgia") | Wengang Yu, Kaiyou Lin, Deyin Li, Yi Wang, and Sigang Zhang |
| Brannon Crossing Partners LLC ("Brannon Crossing") | Shoppes at Brannon Crossing ("Shoppes at Brannon") | Ninglanta |
| Walks at Johns Creek Partners LLC ("Johns Creek") | Sugarloaf Center ("Sugarloaf") (originally the Walks) | Jacob Fu, Larina Hsiu-Lan Lin, Wanjiong Lin, Tan-Yu Lee, and Anni Lee |

AO 72A
(Rev.8/82)

| | | |
|---|---|---|
| Windward Market Forest LLC ("Windward Market") | Market Forest Shops | Yu Shi, Jiang Bian, Fangfang Guo, Kaiyou Lin, Deyin Li, and Capital Investment |
| Palisades West Paces Partners LLC ("Palisades") | North Atlanta Primary Care condominium ("North Atlanta Primary Care") | ChenChao Wang, Kaiyou Lin, Fangfang Guo, and Joshua Fu |
| GII Spalding Plaza LLC | Spalding Plaza shopping center ("Spalding Plaza") | Goldenfield |
| Cooper Village Partners LLC ("Cooper Village") | Cooper Village Retail Center ("Cooper Retail Center") | Chang Yu, Wengang Yu, Kaiyou Lin, Qiongyang Li, Chenchao Wang, Wenling Zhao, Tan-Yu Lee, Anni Lee, and Emily Fu |
| Peachtree Med Building Partners LLC ("Peachtree Med") | Peachtree Corners Medical Building ("Peachtree Corners") | SiGang Zhang, Fang Han, Wenling Zhao, Kaiyou Lin, and Jacob Fu |
| Eastside Med Partners LLC ("Eastside Med") | Eastside Digital Imaging building ("Eastside Building") | Kaiyou Lin, Chang Yu, Fangfang Guo, Deyin Li, Yajun Sun, Lina Xiao, Yu Shi, Xiaohua Yao, Yi Wang, and Capital Investment |

In late 2017, Plaintiffs grew suspicious that Emily Fu's prior

4

representations regarding their commercial real estate properties were false. Plaintiffs subsequently discovered the fraud scheme that is the basis for this action. Plaintiffs allege Emily Fu defrauded them out of $20 million dollars through various fraudulent acts. Emily Fu admitted that she misappropriated approximately $930,000 from Plaintiffs' bank accounts for her personal use. Plaintiffs' members also discovered that Emily Fu took out loans from Touchmark for which the Shoppes at Brannon Crossing and Spalding Plaza were provided as security.

Emily Fu further deceived Plaintiffs by not purchasing Sugarloaf Center, North Atlanta Primary Care, and Eastside Building, on behalf of their respective LLCs, despite representing to members that she had. She also inflated the purchase price for Market Forrest Shops, Cooper Retail Center, and Peachtree Corners. Plaintiffs consequently believe Emily Fu converted the unused cash funds provided for those purchases to her own personal use.

Plaintiffs bring this action for recovery of the missing funds from Emily Fu, as well as her alleged accomplices: the Defendants in default, Defendants Joshua and Jacob Fu, and Touchmark. The Court will now detail the specific background facts as they pertain to the remaining Defendants.

5

*Joshua and Jacob Fu*

According to Plaintiffs, Emily Fu's sons, Jacob and Joshua Fu ("Fu brothers") acted as her accomplices in certain transactions that played a central role in the scheme. They were both members of Capital Investment during the fraudulent transactions, with Joshua as the company's registered agent, and Jacob as the CFO and secretary.[3] Further, on more than one occasion, each brother failed to contribute agreed upon funds for certain real estate purchases and withheld that information from the other LLC members, while accepting profit distributions.

Specifically, Plaintiffs allege Jacob executed this scheme as a member of Johns Creek and Peachtree Med LLCs. Joshua did the same as a member of the Palisades LLC. As an LLC member, Plaintiffs allege, each brother agreed to contribute a certain amount of money for the purchase of a previously designated commercial real estate investment.[4] Yet, neither brother contributed

---

[3] Jacob was CEO and CFO from 2011 to 2014. In 2014, Nina Xu took over as CEO but Jacob remained CFO until 2017.

[4] In February 2015, Jacob agreed to provide $1,710,354.36 in funds for the purchase of the Walks as a member of Johns Creek LLC. In March 2016, Jacob agreed to provide $43,793.00 in funds for the purchase of Peachtree Corners as a member of Peachtree Med LLC. In February 2016, Joshua agreed to provide

6

any money.  Plaintiffs maintain the LLC members never knew about these missing payments and the brothers collected profits from the investments as if they had contributed funds.  Further, Emily Fu never purchased any property for Johns Creek or Palisades LLC, despite telling members she had.

*Touchmark*

Plaintiffs allege Touchmark National Bank participated in Emily Fu's scheme as a strategic partner.  The two had a symbiotic relationship, with Emily even describing Touchmark as her official "Strategic Partner" in a presentation to prospective buyers.  This relationship, Plaintiffs argue, allowed Emily to take out the two unauthorized loans undetected and involved a fraudulent kickback scheme.

Emily's main contact was Stacy Cooke, a Vice President/Commercial Relationship Manager at Touchmark until his sudden death in 2017.  Plaintiffs believe he facilitated the unauthorized loans taken out with the Shoppes at Brannon Crossing and Spalding Plaza as security.  While Plaintiffs admit Emily made false representations and presented forged documents to

---

$72,500.00 in funds for the purchase of North Atlanta Primary Care as a member of Palisades LLC.

Touchmark to obtain the loans, they maintain the bank is at fault because it failed to conduct a proper investigation into Emily's authority to take out the loan or the authenticity of the documents, despite what Plaintiffs claim was reasonable.

In fact, Touchmark did not follow it's own written procedures for confirming authorization of representatives. The Limited Liability Company Authorization Form was not completed properly. For the Brannon Crossing loan, Emily signed the document, but did not provide attestation by an LLC Manager or Designated Manager, as required. The Spalding Plaza loan lacked any attestation signature. She was not the Manager of either LLC for which she obtained the loans. Emily also requested loan notices be sent to her office, while the IRS notice submitted with each loan application had the LLC owner's local address. Plaintiffs argue this should have been a red flag.

Plaintiffs also allege that Emily and Touchmark engaged in an illegal kickback scheme in which Emily was an agent of Touchmark. Specifically, Plaintiffs claim Touchmark represented that the "loan/broker" fees were higher than they should have been. First, with the Mall of Georgia purchase loan, Touchmark represented that the "loan/broker" fee was 4% of the loan or

$76,000. Second, for the Brannon Crossing unauthorized loan, Touchmark represented that the "loan/broker" fee was 2.5% of the loan or $150,000. Third, while less specific, Plaintiffs also claim Touchmark charged exorbitant fees in connection with the unauthorized Spalding Plaza loan and loans on Cooper Village, Peachtree Med, and Windward Market.

Plaintiffs, assert that Touchmark has represented that the normal range of fees for commercial real estate loans is 0.5% to 1%. (Touchmark's Resp. to TRO, Dkt. [23] p. 4.) They argue that Emily and Touchmark conspired to inflate the fees, with Capital Investment receiving the excess portion of the fee. As evidence, they point to Touchmark's admission that it kept only $60,000 of the $150,000 loan/broker fee for Brannon Crossing, (Id.) and that Touchmark did not disclose that it split the fee with Capital Investment. Further, neither Emily Fu nor Capital Investment is licensed in Georgia as a mortgage broker or otherwise authorized to receive loan fees.

## III.    Procedural Background

Plaintiffs filed this suit [1] on December 20, 2017, as well as a Motion for Temporary Restraining Order [4], the following day. The Court granted Plaintiffs a TRO [5] on December 27, 2017 and subsequently converted it to a

9

Preliminary Injunction [10].  Plaintiffs then filed a First Amended Complaint

[14], as well as a motion for a second TRO [20] soon thereafter.  The Court

granted Plaintiffs a second TRO [25], which is currently in effect, along with a

discovery stay [80], until resolution of these pending motions.  ServisFirst

Bank moves to intervene [49] in this action and prematurely moves for relief

from the second TRO [50].  Defendants Joshua and Jacob Fu, and Touchmark

move separately to dismiss claims against them.  The Court now considers

these motions in turn.

## Discussion

### I.    Motions to Dismiss

####    A.    Motion to Dismiss Legal Standard

Rule 8(a)(2) requires that a pleading contain a "short and plain statement

of the claim showing that the pleader is entitled to relief."  While this pleading

standard does not require "detailed factual allegations," mere labels and

conclusions or "a formulaic recitation of the elements of a cause of action will

not do."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 555 (2007)).  To withstand a motion to dismiss, "a

complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).  A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged.  Id.  "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 (11th Cir. 1999).  However, the same does not apply to legal conclusions set forth in the complaint.  Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009).  Nor will the Court "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

B.     Jacob and Joshua Fu's Second Motion to Dismiss [43]

Defendants Jacob and Joshua Fu ("Fu brothers") move to dismiss the federal RICO violations against them in Counts I and II, as well as the Georgia RICO violation in Count VIII.  Further, the Fu brothers request the Court decline to exercise supplemental jurisdiction, after dismissing the only federal claims against them.  The Court will address the federal and Georgia RICO

11

violations in turn, but will reserve jurisdictional analysis for section II of this Order.

### 1. *Federal RICO Claims (Counts I & II)*

The Fu brothers advance two alternative dismissal theories regarding Plaintiffs' civil RICO claims under 18 U.S.C. § 1962(c) and (d). They first argue both claims are barred by section 107 of the Private Securities Litigation Reform Act, 18 USC §1964(c) (the "PSLRA" or "RICO Amendment") because they involve securities. In the alternative, they argue both claims fail to meet the Rule 9(b) heightened pleading standard for RICO complaints.

Section 1964 of Title 18 of the United States Code provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). To bring a claim for a violation of § 1962, Plaintiffs must demonstrate "a pattern of racketeering activity." § 1962(a). A pattern of racketeering activity requires at least two acts of racketeering activity within the last 10 years as defined in § 1961(1). § 1961(5). Congress, however, amended RICO as part of the PSLRA to bar civil RICO actions based on predicate acts that include "any conduct that

would have been actionable as fraud in the purchase or sale of securities." § 1964(c).[5]

The Fu brothers argue that the predicate offences alleged amount to securities fraud. Plaintiffs' in turn argue they have only alleged mail and wire fraud, and further that they could not allege securities fraud because this case does not involve a security. As a preliminary matter, Plaintiffs cannot avoid the PSLRA bar by omitting allegations of securities fraud. See Licht v. Watson, 567 F. App'x 689, 693 (11th Cir. 2014) (citing Bald Eagle Area School Dist. v. Keystone Fin., Inc., 189 F.3d 321, 331 (3d Cir.1999) ("[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud."); MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277 (2d Cir.2011) (holding that the PSLRA bar applies "even where a plaintiff cannot itself pursue a securities fraud action against the defendant"); Howard v. Am. Online Inc., 208

_____

[5] The bar does not apply if the RICO action is against a defendant who is criminally convicted in connection with the fraud. § 1964(c). Here, Emily Fu pleaded guilty to one count of mail fraud under 18 U.S.C.§ 1341. Therefore, the PSLRA does not bar the RICO claim against Emily Fu, who has a default judgment against her in this action.

AO 72A
(Rev.8/82)

F.3d 741, 749 (9th Cir.2000) (holding that the RICO bar applies even where the plaintiff does not have standing to sue under securities laws because the plaintiff did not buy or sell securities)).

The relevant inquiry focuses on if the conduct the Plaintiffs pled as the predicate acts for their RICO claim *could* amount to securities fraud. Section 10(b) of the Securities Exchange Act of 1934 includes any fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). The Supreme Court interprets this phrase "not technically and restrictively, but flexibly to effectuate [the statute's] remedial purposes." <u>SEC v. Zanford</u>, 535 U.S. 813, 819 (2002) (quoting <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 151 (1972) (internal quotation marks omitted)). Further, the Fu Brother's specific actions do not have to be actionable as securities fraud because being part of "a single fraudulent scheme" is sufficient. <u>See</u> <u>Seippel v. Jenkens & Gilchrist, P.C.</u>, 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (applying <u>Zandford</u>, 535 U.S. at 820 (2002)).

Here, while the alleged individual misrepresentations or omissions may be classified as mail or wire fraud, they were done to execute the greater

AO 72A
(Rev.8/82)

scheme of inducing Plaintiffs to invest in limited liability companies that then invested in real properties. Through this arrangement, each Defendant allegedly played various roles in various misrepresentations made to Plaintiffs. The specific allegations against the Fu brothers center around their role as members and capitol contributors for the Johns Creek, Peachtree Med, and Palisades LLCs. In sum, Plaintiffs allege that Jacob Fu, and Joshua Fu did not contribute funds toward the purchase price or contributions to these LLCs, contrary to their representations, but nevertheless accepted profit distributions from the related entities. (Pls.' SAC, Dkt. [40] ¶ 264.) These allegations could plausibly amount to fraud and given their relationship to the LLCs would be actionable as securities fraud if a security was present in the transaction.

Thus, this issue boils down to whether the Plaintiffs' LLCs were securities. Generally, ownership interests in corporations are considered securities because the shareholders lack control, while ownership interests in general partnerships and joint ventures tend not to be securities because of the active role of the partners. See, e.g., Williamson v. Tucker, 645 F.2d 404, 422-

15

23 (5th Cir. May 20, 1981).[6]  That said, LLCs are a hybrid entity, requiring a closer look at their individual construction.

Both the Securities Act of 1933 and the Exchange Act of 1934 include "investment contract" in their definitions of a "security." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  "The 'investment contract' has been one of the means employed to bring 'instruments of more variable character' within the scope of the federal securities laws."  Youmans v. Simon, 791 F.2d 341, 345 (5th Cir.1986) (quoting Landreth Timber Co. v. Landreth, 471 U.S. 681, 686, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985)) (internal quotations omitted).  The Supreme Court in SEC v. W.J. Howey Co. identified an investment contract as a scheme in which a person (1) invests money, (2) in a common enterprise, and (3) is led to expect profits solely from the efforts of the promoter or a third party.  328 U.S. 293, 298-99 (1946).  Plaintiffs argue the last prong is not met here, because Emily Fu was merely a hired manager while the Plaintiff-investors maintained ultimate control.  The Court disagrees.

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions from the former Fifth Circuit decided on or before September 30, 1981.

16

Despite Plaintiffs' arguments otherwise, under the third prong of <u>Howey</u>, "solely" is not interpreted restrictively. "The Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests." <u>Williamson</u>, 645 F.2d at 418. "An interest thus does not fall outside the definition of investment contract merely because the purchaser has some nominal involvement with the operation of the business." <u>S.E.C. v. Merch. Capital, LLC</u>, 483 F.3d 747, 755 (11th Cir. 2007). Instead, "the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party." <u>Gordon v. Terry</u>, 684 F.2d 736, 741 (11th Cir.1982).

In reality, this is a situation where Plaintiffs' prospective returns hinged almost entirely on Emily Fu's essential managerial efforts. Between 2014 and 2017, Emily Fu assisted groups of Chinese investors with purchasing and managing commercial real estate properties in the metro-Atlanta area. Each of the nine named Plaintiffs in this action is an LLC created, with Emily Fu's assistance, for the purpose of purchasing a specific commercial property.

17

For each LLC, Emily Fu: 1) found the property; 2) proposed a purchase price; 3) took potential Chinese buyers and/or their representatives on a tour of the property; 4) served as the real estate broker for the transaction, including by recommending and engaging legal and other advisors and coordinating third party services such as environment and property appraisals; 5) offered to serve as a liaison between the buyers and the property management company that would be hired to manage the property; 6) was named "Manager" in all by two LLC operating agreements; 7) used a Capital Investment bank account to receive members' payment of earnest money for the purchase; 8) opened bank accounts in the LLC's name at Touchmark or Metro City Bank; 9) instructed members to wire money from China into the bank account; 10) served as a conduit for information between the LLC members and the property management company; 11) emailed periodic financial statements for the property to LLC members; 12) transmitted financial data by email to the LLC's accountants for tax preparation purposes and prepared and periodically emailed members a statement showing the ownership percentages and profit distribution for each member; and 14) signed the purchase statement as Manager of the company for some transactions.

18

Perhaps most significantly, Emily Fu unilaterally decided that Johns Creek LLC should purchase the Sugarloaf Center instead of Walks, informed Johns Creek of this decision, but did not actually purchase any property. The only powers Plaintiffs retained over the LLCs were formal, such as the requirement for prior written consent of one specific member for any sale or financing arrangement related to the property, and unanimous consent of all members was required for certain other actions. Plaintiffs have not indicated what those other actions were. As a result of the balance of power between Emily Fu and the Chinese members, the members retained little ability to control the profitability of the investment. In fact, further evidence of their lack of control is Emily Fu's ability to defraud them in so many ways.

Plaintiffs suggest the Court narrow its review of these agreements to see them as real estate transactions. While it is true that the ultimate investments were in real estate, and that "real estate transactions are not generally investment contracts," the scope of that rule is much narrower than the definition of an investment contract that Plaintiffs try to avoid. Alunni v. Dev. Res. Grp., LLC, No. 608CV-1349-ORL-31DAB, 2009 WL 2579319, at *6 (M.D. Fla. Aug. 18, 2009), aff'd, 445 F. App'x 288 (11th Cir. 2011). For

AO 72A
(Rev.8/82)

example, Plaintiffs are correct that the individual agreements between the LLCs and the renters at each property are not investment contracts. But those agreements alone are not at issue here because they are part of a larger investment scheme. Id. ("[C]ertain real estate transactions may constitute the sale of securities if the purchaser expects to participate in a profit-sharing or rental pooling arrangement upon completing the transaction, or when the transaction includes restrictions limiting the owner's control over the property.") Most notably, formation of the "LLCs necessary to the [real estate] transactions and manipulation of the ownership shares in those LLCs constitute securities" themselves because memberships in these LLCs are investment contracts. See AFFCO Investments, LLC v. KPMG, LLP, CIV.A. H-07-3379, 2008 WL 5070053, at *3 (S.D. Tex. Nov. 20, 2008), aff'd sub nom. Affco Investments 2001, L.L.C. v. Proskauer Rose, L.L.P., 625 F.3d 185 (5th Cir. 2010).

Plaintiffs also rely on Perry v. Gammon, 583 F. Supp. 1230 (N.D. Ga. 1984) as an example of a non-investment contract real estate investment. Perry, however, is distinguishable. Id. Foundationally, Perry involved a limited partnership instead of an LLC. Id. at 1232. Similarly, the Perry

20

investment properties were only a state away, as opposed to the distance here between the Chinese investors and their American investment properties. Id. 1233. Further, unlike the Perry manager, Emily was not a reliable manager Plaintiffs continued to turn to oversee their properties. Id. ("[T]he partners' clear preference of Beltway as management agent and the attractive opportunity of retaining Beltway as manager of the apartment complexes under their new ownership do not transform the sales to the partnerships into securities transactions,"). Instead, she was the investment instigator. Without Emily's connections to the area, Plaintiffs would not have been able to find these properties. What is more, unlike in Perry, Plaintiffs Johns Creek, Palisades, and Eastside Med do not have the freedom to buy and sell the real estate at their will because, due to Emily's control over the operation, they don't actually own any property. Id.

Ultimately, these LLCs were common enterprise investment opportunities where investors relied on Emily Fu's expertise for profit and should be governed by securities law not § 1962(c) and (d). See Securities & Exchange Commission v. Edwards, 540 U.S. 389 (2004) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form

they are made and by whatever name they are called. To that end, it enacted a broad definition of security, sufficient to encompass virtually any instrument that might be sold as an investment.").

Here, Emily Fu marketed and sold investment opportunities funneled though membership in LLCs to investors far removed from their investments. See Gordon, 684 F.2d at 742 (noting an example of the sort of dependency contemplated by investment analysis is when "investors may be induced to enter a real estate partnership on the promise that the partnership's manager has some unique understanding of the real estate market in the area in which the partnership is to invest.") (citing Williamson 645 F. 2d at 423). All pleadings indicate the members were "attracted solely by the prospects of a return" on their investments. Howey, 328 U.S. at 293, 300. Further, they relied on Emily Fu to manage and develop their investments for them given her "unique understanding of the real estate market in the area." Gordon, 684 F.2d at 741–742. Especially given the geographic distance and language barrier, the members were unable to participate in the management of these transactions in any meaningful way, regardless of their actual expectations when drafting the operating agreements.

AO 72A
(Rev.8/82)

The Court therefore concludes that these LLCs, created for the purpose of investing in foreign commercial real estate with managerial reliance on Emily Fu as their US representative, are investment contracts and thus, securities. And, the presence of securities with the Fu brother's alleged fraudulent acts triggers the PSLRA bar to Plaintiffs' RICO claims against them. As such, the Court need not consider Defendants' Rule 9(b) argument, and Defendants Jacob and Joshua Fu's Motion [43] is **GRANTED** as to Plaintiffs' Counts I and II against them.

### 2. *Georgia RICO Claim (Count VIII)*

Plaintiffs assert a cause of action against Jacob and Joshua Fu under the Georgia RICO conspiracy statute. Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A. § 16-14-4(a). The Fu brothers argue that this civil RICO conspiracy claim must also fail because the Second Amended Complaint [40] does not sufficiently allege any predicate act.

23

Plaintiffs base this claim on their allegations that Jacob and Joshua Fu failed to contribute agreed upon funds for the purchase of certain real estate and deliberately withheld this information from the other LLC members while at the same time benefitting from profit distributions. Plaintiffs allege Jacob withheld funds from the Johns Creek and Peachtree Med LLCs and Joshua from the Palisades LLC.

In their Second Amended Complaint, Plaintiffs claim these allegations satisfy claims of theft by deception under O.C.G.A. § 16-8-3 and theft by conversion under O.C.G.A. § 16-8-4.[7] Both of these are predicate acts that can constitute racketeering activity under Georgia's RICO statute. O.C.G.A. § 16-14-3(5)(A)(xii). Under § 16-8-3(a), "[a] person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." Further,

> [a] person commits the offense of theft by conversion when,

_____

[7] In their Response [54], Plaintiffs also note that predicate acts under the federal RICO statute, such as mail and wire fraud, independently suffice as predicate acts under the Georgia RICO act. O.C.G.A. § 16-4-395)(C). While the Fu brothers have not challenged these claims, the Court is skeptical that Plaintiffs have alleged either against them. That said, because Plaintiffs have not hung their Georgia RICO claim on these predicate acts, the Court need not consider the issue at this stage.

24

having lawfully obtained funds or other property of another including, but not limited to, leased or rented personal property, under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, he knowingly converts the funds or property to his own use in violation of the agreement or legal obligation.

§ 16-8-4.

The Fu brothers' do not break down why Plaintiffs have not sufficiently alleged these claims against them, but instead generally argue Plaintiffs rely on a handful of allegations against them that do not amount to either claim. The Court disagrees. As the Fu brothers recognize, the "Second Amended Complaint evidences a continued, thorough investigation by the Plaintiffs with extensive additional information regarding the misconduct alleged in the Complaint." (Defs.' Reply, Dkt. [65] at 3.) The Fu brothers' alleged misconduct, taken as true, supports at least a theft by deception claim. As such, Defendants' Motion is **DENIED** as to Count VIII.

### C.    Touchmark's Motion to Dismiss [59]

Defendant Touchmark moves to dismiss Plaintiffs' federal RICO (Counts I and II); aiding and abetting breach of duty (Count VI); civil conspiracy (Count XII); and punitive damages (Count XVI) claims against

them.  The Court will consider each in turn.

> 1.  *Federal RICO Claims (Counts I & II)*

Defendant Touchmark argues Plaintiffs' Federal RICO claims under §

1962(c) and (d) are due to be dismissed because both claims fail to meet the

Rule 9(b) heightened pleading standard for RICO complaints.  The Court,

however, need not reach that argument. Though Touchmark did not raise the

issue, the Court finds no material basis to distinguish the connection of

Touchmark's alleged misconduct to the Plaintiff-LLCs from the Fu brother's

alleged misconduct.  The Court reaches this conclusion after carefully

reviewing Plaintiffs' argument against the PSLRA bar as it pertains to the

investment contracts in this case.

For the PSLRA bar to apply, the Court must find that the conduct

Plaintiffs pled as Touchmark's predicate acts for their RICO claim could

amount to securities fraud.  Section 10(b) of the Securities Exchange Act of

1934 includes any fraud "in connection with the purchase or sale of any

security." 15 U.S.C. § 78j(b).  The Court determined that the LLCs are

investment contracts and thus, securities.  Therefore, the remaining inquiry is

whether Touchmark's alleged fraud was connected to the securities.[8]

The allegations against Touchmark center around their role as the bank from which Emily Fu obtained loans on Plaintiffs' behalf. Specifically, Plaintiffs' allege Touchmark directed Emily Fu to seek out borrowers for Touchmark Commercial Loans, receiving a percentage of its above-market loan fees in return. Touchmark did not disclose this kickback agreement to Intelligent or Brannon Crossing, and Emily Fu was not licensed to receive such fees. Further, the loan closing statement containing these allegedly fraudulent fees was sent via email by Stacy Cooke. Plaintiffs argue this scheme contravenes the prohibition against unfair and deceptive practices under 12 C.F.R. § 34.3(c) and, at a minimum, constitutes wire fraud. The Court finds that, if true, these actions were part of Emily Fu's larger fraudulent scheme and are therefore sufficiently connected to the securities to trigger the PSLRA bar.

Accordingly, Plaintiffs' Counts I and II are **DISMISSED** against Defendant Touchmark.

---

[8] The Court applies the legal standard detailed on pages 6-7 of this Order.

AO 72A
(Rev.8/82)

2.    *Aiding and Abetting Breach of Fiduciary Duty (Count VI)*

Under Georgia law, aiding and abetting breach of fiduciary duty is established by proof that:

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Insight Technology, Inc. v. Freight Check, L.L.C., 633 S.E.2d 373, 379 (Ga. Ct. App. 2006).  "[T]o procure" does not require "the lending of assistance in the actual perpetration of the wrong," but does require giving "advice, counsel, persuasion, or command . . . in procuring any person to commit an actionable wrong." Id. at 379 n.12; see also Floyd v. SunTrust Banks, Inc., No. 1:10-CV-2620-RWS, 2011 WL 2441744, at *2 (N.D. Ga. June 13, 2011) ("[T]he key to [an aiding and abetting breach of fiduciary duty] claim is inducing the privilege holder to improperly act.").  Similarly, "malice and the intent to injure" in this context means "any unauthorized interference, or any interference without legal justification or excuse," but "[p]ersonal ill will or

animosity is not essential." <u>Insight</u>, 633 S.E.2d at 379 n.13.

Plaintiffs assert a claim for aiding and abetting breach of fiduciary duty against Touchmark. They allege Touchmark knew Emily Fu was breaching her fiduciary duty to Plaintiffs Intelligent, Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, Eastside Med, and GII Spalding, and aided such breaches by facilitating her false representations or otherwise assisting or being complicit in Emily Fu's fraudulent actions. While somewhat unclear from the Second Amended Complaint, it appears from their Response that Plaintiffs focus this claim on the allegations that Stacy Cooke intentionally entered into an agreement with Emily Fu for loan fee kickbacks. Because these kickbacks benefitted Touchmark and Emily Fu to the detriment of Plaintiffs, Emily Fu violated her fiduciary duty to the LLCs as their Manager or Executive Vice President. By intentionally entering into this fraudulent and potentially illegal agreement, Plaintiffs maintain, Touchmark acted with malice and intent.

Touchmark contends that Plaintiffs have failed to adequately plead the first two elements of their claim. First, Touchmark argues that it did not act "without privilege" because, it has a secured interested in the properties at issue

and therefore are not strangers to the relationships between these entities and Emily Fu.  Second, Touchmark argues it did not act with malice and the intent to injure because Plaintiffs have not alleged that Touchmark was aware that Emily was abusing Plaintiffs' authority.

As to their first element,  Plaintiffs allege Emily Fu breached her fiduciary duty to Plaintiffs Intelligent, Johns Creek, Windward Market, Palisades, Cooper Village, Peachtree Med, Eastside Med, and GII Spalding.  Per the operating agreements, Emily was either the Manager or Executive Vice President of these LLCs and therefore owed a duty to act in each one's best interest.  See Quinn v. Cardiovascular Physicians, P.C., 326 S.E.2d 460, 463 (Ga. 1985) ("It is settled law that corporate officers and directors occupy a fiduciary relationship to the corporation and its shareholders, and are held to the standard of utmost good faith and loyalty.").  She breached that duty in various ways, but Plaintiffs' claim for aiding and abetting breach of fiduciary duty focuses Touchmark's inducement of Emily Fu to breach her fiduciary duty embedded in the operating agreement, or contract, to use the language

generally associated with this claim.[9]

Touchmark's own lending relationship with the LLCs does not give them a direct economic interest in Emily Fu and the LLCs' business relationship to exempt them from aiding or abetting liability. See U.S. Capital Funding VI, Ltd v. Patterson Bankshares, Inc., 137 F. Supp. 3d 1340, 1379 (S.D. Ga. 2015). The focus of the stranger to the contract rule is not on the alleged breach, but on the aider and abetter's relationship to the contract or business relationship with which they allegedly interfered. Here, Touchmark was not a party to the operating agreement and does not stand to benefit from the operating agreement. Instead, Plaintiffs allege Touchmark interfered with the operating agreement by inducing Emily to defraud Plaintiffs through a kickback scheme.

As to Touchmark's claim that Plaintiffs have not alleged malice or intent to injure, the Court finds that Plaintiffs have met their burden on this element with the regard to the kickback scheme. Plaintiffs allege Stacy Cook and Emily Fu knowingly entered into this scheme together which benefitted Touchmark at

---

[9] "The tort of aiding and abetting requires proof of virtually the same elements as the tort of tortious interference with business relations." Kahn v. Britt, 765 S.E.2d 446, 458 (Ga. Ct. App. 2014). Thus, many cases concerning this claim speak in terms of a "contract" or "business relationship."

AO 72A
(Rev.8/82)

Plaintiffs' expense.  See Wright v. Apartment Inv. & Mgmt. Co., 596, 726 S.E.2d 779, 788 n. 8 (2012) ("An act is malicious when done with the knowledge of plaintiff's rights and with intent to interfere therewith ...."). Thus, Touchmark's motion is **DENIED** as to Count VI.

    *3.    Civil Conspiracy (Count XII)*

    "To recover damages based on a civil conspiracy, a plaintiff must show that two or more persons combined either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort .... [t]he conspiracy of itself furnishes no cause of action."  McIntee v. Deramus, 722 S.E.2d 377, 379 (2012) (internal quotation marks omitted).  Similar to their objections to allegations of malice for Plaintiffs' aiding and abetting breach of fiduciary duty claim, Touchmark again argues Plaintiffs have not alleged that it knew that Emily Fu intended to defraud Plaintiffs.  Again, the Court disagrees.

    According to Plaintiffs, Touchmark and Emily schemed to find unwitting borrowers, charge them exorbitant fees, and fraudulently kickback a portion of the fees to Emily, while misrepresenting the fees to Plaintiffs.  If true, these allegations evidence Touchmark and Emily acted in concert and thus support a

civil conspiracy claim. Id. Further, these allegations rest on the underlying tort allegation set forth above. Jenkins v. Wachovia Bank, Nat'l Ass'n, 711 S.E.2d 80, 85 (2011) ( "Absent the underlying tort, there can be no liability for civil conspiracy."). Therefore, Touchmark's Motion [59] is **DENIED** as to Count XII.

### 4. Punitive Damages (Count XVI)

Touchmark argues Plaintiffs' punitive damages claim against them fails for two reasons. First because their underlying tort claims fail, and second because Plaintiffs have not alleged that Touchmark's actions showed the "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care" necessary to support an award of punitive damages. O.C.G.A. § 51-12-5.1(b). Plaintiffs' underlying tort claims for aiding and abetting break of fiduciary duty and civil conspiracy, however, are sufficiently pled and support a claim for punitive damages. Thus, Touchmark's Motion [59] is **DENIED** as to Count XVI.

## II. Supplemental Jurisdiction

The Court's original jurisdiction over this action is federal question

33

under 28 U.S.C. § 1331 for Plaintiffs' federal RICO claims. Notably, the clerk properly entered a default judgment against Defendant Emily Fu on October 19, 2018 for all claims against her, including the federal RICO claims. Federal RICO claims were proper against Emily because she was criminally convicted in connection with the fraud. Consequently, the Court retains federal question jurisdiction. However, because the federal question claims have been dismissed against the non-default Defendants, the Court may decline to exercise supplemental jurisdiction over the remaining state law claims against them. 28 U.S.C. § 1367 (c). The Fu brothers urge the Court to do so, while Plaintiffs maintain that all Defendants should remain in this federal action because the claims against them derive from the same controversy.

Supplemental jurisdiction is proper where the relationship between the federal and state claims is such that they "form part of the same case or controversy under Article III of the United States Constitution." 28 USC § 1367(a). A single case exists in the constitutional sense wherever the state and federal claims arise from "a common nucleus of operative facts" such that a plaintiff "would ordinarily be expected to try them all in a single judicial proceeding." United Mine Workers v. Gibbs, 383 US 715, 725 (1966).

AO 72A
(Rev.8/82)

All parties and the Court appear to agree that the state law claims against the non-default Defendants form part of the same case or controversy as the claims against Emily Fu. Further, this is a complicated case that has been pending in federal court since December 20, 2017, and will proceed even if the state claims against Touchmark and the Fu brothers are dismissed without prejudice. Thus, considerations of fairness and judicial economy warrant the Court's retention of supplemental jurisdiction over these claims. The Fu brother's Motion [43] is therefore **DENIED** on this ground.

## III. ServisFirst Bank's Motion to Intervene

ServisFirst moves to intervene [49] as a party Defendant in this case. Under Rule 24(a)(2) of the Federal Rules of Civil Procedure, an individual may intervene as of right in a pending action if "the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." See Fed. R. Civ. P. 24(a)(2). A party seeking intervention under Rule 24(a)(2) must

AO 72A
(Rev.8/82)

demonstrate that: (1) his application to intervene is timely; (2) he has an interest relating to the property or transaction which is the subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) his interest is represented inadequately by the existing parties to the suit. Worlds v. Dep't of Health and Rehabilitative Servs., 929 F.2d 591, 593 (11th Cir. 1991) (quoting Chiles v. Thornburgh, 865 F.2d 1197, 1213 (11th Cir. 1989)).

An individual may also be permitted to intervene in an action under Rule 24(b)(2) if the Court determines in its discretion that the intervention will not unduly delay or prejudice the rights of the original parties, and the potential intervenor has a "claim or defense" which shares a common question of law or fact with the plaintiff's claims. See Fed. R. Civ. P. 24(b)(2). Thus, a party seeking to intervene under Rule 24(b)(2) at a minimum must show that: (1) his application to intervene is timely; and (2) his claim or defense and the main action have a question of law or fact in common. Chiles, 865 F.2d at 1213. "The district court has the discretion to deny intervention even if both of those requirements are met, and its decision is reviewed for an abuse of discretion." Id.

Plaintiffs do not object to ServisFirst's intervention, and neither do a majority of Defendants. Indeed, only Defendant Touchmark objects, arguing ServisFirst cannot intervene as a matter of right because it cannot meet elements two, three, or four of the standard. Although the Court disagrees with Touchmark, it need not analyze the intervention as a matter of right factors because the Court will permit ServisFirst to intervene.

ServisFirst's timely application[10] focuses on their interest in the unauthorized loans taken out with the Shoppes at Brannon Crossing and Spalding Plaza as security. Most significantly, ServisFirst has a 90% interested in the Brannon Crossing loan and worries their interests in repayment are not adequately represented by Touchmark. While Touchmark advances a series of arguments as to why ServisFirst should not intervene as a matter of right or permission, it does not argue that it would be prejudiced by intervention or that ServisFirst's claims are not connected to the action by a common question of law or fact. Ultimately, "[a]ny doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors because it

---

[10] Touchmark concedes the application was timely.

37

allows the court to resolve all related disputes in a single action." <u>Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.</u>, 983 F.2d 211, 216 (11th Cir. 1993). Accordingly, ServisFirst's Motion [49] is **GRANTED**.

## IV. The TRO

The Court finds that the TRO [25] issued on February 9, 2018 should be revisited now that jurisdictional issues are resolved. Plaintiffs have **14 days** from the date of entry of this Order to show cause why the TRO should be converted to a preliminary injunction to maintain the status quo until a ruling on the merits. Defendants, now including ServisFirst, will have **14 days** thereafter to respond, and may request a hearing at that time. If Plaintiffs elect not to file a timely motion for a preliminary injunction, the TRO will be dissolved. Accordingly, ServisFirst's Motion for Relief from Order on Motion for TRO [50] is **GRANTED in part and DENIED in part**, concordant with the above findings.

### Conclusion

For the foregoing reasons, Defendants Jacob Fu and Joshua Fu's Second Motion to Dismiss [43] is **GRANTED** as to Counts I and II, and **DENIED** as

AO 72A
(Rev.8/82)

to Count VIII; Defendant Touchmark Nation Bank's Motion to Dismiss in Part [59] is **GRANTED** as to Counts I and II, and is otherwise **DENIED**; ServisFirst Bank's Motion to Intervene [49] is **GRANTED**; and ServisFirst Bank's Motion for Relief from Order on Motion for TRO [50] is **GRANTED in part and DENIED in part**. Plaintiffs have **14 days** from the date of entry of this Order to show cause why the TRO should be converted to a preliminary injunction to maintain the status quo until a ruling on the merits. Defendants, now including ServisFirst, will have **14 days** thereafter to respond, and may request a hearing at that time.

Per the Court's September 10, 2018 Order [80], the discovery period shall commence **15 days** after the entry of this Order. It is further **ORDERED** that the Rule 26(f) Early Planning Conference shall be held within 15 days after the entry of this Order, and the parties shall submit to the Court the Joint Preliminary Report and Discovery Plan within 15 days after the parties hold their Early Planning Conference.

**SO ORDERED**, this 20th day of March, 2019.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)